88 *N. J. L.* State v. Dougherty.

---

THE STATE, DEFENDANT IN ERROR, v. HARRY DOUGHERTY AND JOHN MURTLAND, PLAINTIFFS IN ERROR.

Argued June 23, 1915—Decided November 15, 1915.

An indictment charged a conspiracy to pervert the due administration of the laws. The proof was of an agreement by defendants with a detective in the employ of the state's law officers to detect defendants in corrupt conduct, by which the detective was to pay them money for their votes as members of a city council. *Held*, that, as the indictment charged but one conspiracy to which the detective was proved to be a necessary party, and as his object was to expose corruption and prevent injury to the public, there was a failure to prove a conspiracy to pervert the due administration of the laws.

---

On error to the Supreme Court, whose opinion is reported in 86 *N. J. L.* 525.

For the state, *Charles S. Moore,* prosecutor of Atlantic county, and *Edmund Wilson.*

For the plaintiffs in error, *Robert H. McCarter (William F. Sooy* on the brief).

The opinion of the court was delivered by

SWAYZE, J. The first count in the indictment, on which alone the state elected to stand, charges that the plaintiffs in error and others named, conspired to pervert the due administration of the laws relating to the municipal govern-

ment of Atlantic City by corruptly passing an ordinance for the passage of which the nine defendants (including the two now plaintiffs in error) were to receive as bribes from one Harris, a person interested in securing the passage of the ordinance, the sum of $500 each; that the defendants in execution of said agreement passed the ordinance and in further execution of the agreement received the sums agreed upon as bribes. At the trial it was proved that Harris was an alias for Reed who was in the employ of a detective engaged under the direction of the law officers of the state in the effort, which for four months had been unsuccessful, to detect the defendants in corrupt conduct as members of the council of Atlantic City; that the whole scheme was a plot contrived by him for the purpose of luring members of the common council by the promise of money into voting for an ordinance for a large public work, the merit of which by itself is not questioned; that it was never meant to proceed with the work when authorized, the only object being to catch the defendants in corrupt conduct. There was no evidence that any money was ever paid to Murtland. While the ordinance was pending Murtland asked Reed how much money he was to receive that day, said that he would not accept $500, that he did not care to take the risk with less than $5,000; and after some further conversation added that he would not interfere with the programme and wished to be remembered when it came to the contract.

We think it is unnecessary to consider the very interesting and important question so ably discussed by counsel, whether it is a good defence to an indictment that the defendants were entrapped into the alleged criminal conduct by representatives of the state. Cases may be found where this defence was rejected and others where it was held good. We limit our decision to the particular facts of this case.

The charge is that there was a conspiracy to pervert the due administration of the laws relating to the municipal government of Atlantic City by corruptly passing an ordinance, for bribes to be paid by Harris, a person interested in securing its passage. The indictment is not for bribery, but

for conspiracy, and not for conspiracy among the defendants alone to sell their votes or to force "Harris" to pay money. The charge is that the conspiracy was with "Harris;" that he was to pay and did pay money. The conspiracy with "Harris" as the prime mover and an essential party is not only the conspiracy charged in the indictment, but the conspiracy on which the state in fact relied at the trial; it was only that alleged conspiracy that made admissible, so far as it was admissible, the testimony as to interviews between "Harris" and Phoebus on December 5th, 1911, at which the two planned for the corruption of the other defendants. It was this conspiracy between "Harris" and Phoebus into which the defendants are said to have come subsequently. The nature of the charge in the indictment relieves us from the necessity of considering the effect of entrapment by the state, which would confront us if the indictment were for a conspiracy by the defendants alone to sell their votes or to extort money as the condition of passing an ordinance introduced in good faith and meant to become effective legislation of the city. The question is the much simpler one, whether a conspiracy originated by "Harris" under employment of the law officers of the state, with Phoebus as either stool pigeon or go-between, for the well meant purpose of testing the virtue of public officials and preventing injury to the public by exposing and bringing them to punishment if they proved corrupt, was a conspiracy to pervert the due administration of the laws relating to the municipal government of Atlantic City. If it was not, the defendants are not guilty as charged, however reprehensible their conduct and character may have been. Since the indictment charges but one conspiracy, and "Harris" was a necessary party to the conspiracy proved, the prime mover therein and the man who was to and did furnish the money, and since the conspiracy had no existence without him, the only conspiracy for which the defendants could be convicted is that organized by "Harris." Unless that conspiracy is criminal, the defendants are not guilty as charged. If it is criminal, "Harris" is also guilty. To so hold, it would be necessary to hold that "Harris'" act was a per-

version of the due administration of the law. To avoid that absurdity, it is necessary to hold that the conspiracy was not a conspiracy to pervert the due administration of the law as charged in the indictment. It was in fact an arrangement to secure the due administration of the law by demonstrating the readiness of the councilmen to be corrupted, in a made-up plan not meant to be executed, in order to prevent by exposure similar corruption in the genuine legislation of the city. Without the complicity of "Harris," the conspiracy charged is not proved; with him it ceases to be a conspiracy to pervert the due administration of the laws, and is no crime. We are less reluctant to reach this result than we would otherwise be, for the reason that the state sought by indicting the defendants for conspiracy to make available statements made by "Harris" and Phoebus in the absence of the other defendants even before they had come into the conspiracy, and by Phoebus after the object of the conspiracy had been obtained. The state having sought and obtained the advantage of an indictment for conspiracy, must in fairness be subjected to its disadvantages. It cannot be permitted by splitting the single conspiracy in two to say one was criminal and the other meritorious; that in one the councilmen alone were involved, in the other "Harris" was also a party, when the fact is that "Harris" was a necessary party throughout. As the Supreme Court of the United States has recently said "the character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States* v. *Patten,* 226 *U. S.* 525, 544.

The case is analogous to the old case where a man arranged through a third party for a highway robbery to be committed upon himself, with a view to receiving a reward offered for the apprehension of highway robbers. It was held that the defendant could not be convicted, since the force requisite to constitute a highway robbery had not been used, the alleged victim having himself authorized it. *R.* v. *MacDaniel, Fost. C. L.* 121; *R.* v. *Fuller, Russ. & R. C. C.* 408. On an indictment for burglary, the entry was

held not burglarious because made with assent of detectives who were in the occupancy and control of a bank with the consent of the owners. "This cannot be burglary," said the court, "in contemplation of law, however much the defendant was guilty in purpose and intent." *Speiden* v. *State,* 3 *Tex. App.* 156; 30 *Am. Cr. Rep.* 126; *R.* v. *Johnson, Car. & M.* 218. On an indictment for bribery where an officer first suggested his willingness to accept a bribe and *apparently* joined the defendant in a criminal act, suggested by the officer, merely to entrap the defendant, the case was held not within the spirit of the criminal code. *O'Brien* v. *State,* 6 *Tex. App.* 665. In larceny where the entrapment is by the owner or a detective or by his agent, their participation takes away the essential element of a conversion against the will of the owner. *Whart. Cr. L.,* § 389.

These cases were decided upon the ground that an essential element of the crime was absent. We do not approve the distinction attempted in the Ohio case of State *v.* Diegle, a report of which was furnished us by the prosecution, between an injury to a private citizen, as in the case of highway robbery, burglary or larceny, and an injury to the public, as in the case of bribery. All crimes alike, under our modern legal theories, are crimes against the public, and all are classified as public wrongs by Blackstone.

We have already stated the difficulty in the present case of holding that an agreement instigated by the state for the public benefit can be changed into a criminal conspiracy by merely dropping out of sight the essential part played by the instigator without whom the conspiracy could not exist. Clear as this is in the case of Dougherty, it is still clearer in the case of Murtland. The principal part of the evidence against him was Reed's (alias Harris') testimony as to what Phoebus said. Phoebus had pleaded guilty, but was not called as a witness, so that he might be cross-examined. The testimony at best was only admissible against Murtland, if it was proved *aliunde* that he and Phoebus were co-conspirators; it could not of itself prove the fact of conspiracy. There was absolutely no proof that Murtland received any money. On

the contrary, Reed's testimony was that Murtland said he would not be satisfied to accept $500, and demanded more, which Reed refused; whereupon Murtland said he would not interfere with the programme, but thought that Reed should remember him when he came to the contract. This is convincing evidence to prove that if Murtland was ever a party to the conspiracy charged, he withdrew as far as he could from that conspiracy before the overt act set forth in the indictment and relied upon by the state—the passage of the ordinance—and trusted to a hope of future favor or at worst entered by a tacit agreement into a new conspiracy with Reed (alias Harris.). This, however, was, to put it most favorably for the state, a conspiracy with Reed alone, and a conspiracy which gave Murtland different rights from his fellow councilmen, in which they would be most unlikely to join, and did not in fact join. If Murtland withdrew from the original conspiracy before the overt act, a jury might well find him not guilty as charged. He cannot be guilty of a conspiracy with Reed alone, unless Reed also is guilty, since it requires at least two to make a conspiracy. Our statute under which this indictment is framed expressly enacts that any *two or more* persons who shall combine to commit any act for the perversion of the due administration of the laws, shall on conviction, be deemed guilty of a conspiracy. *Comp. Stat., p.* 1757, § 37. The attention of the learned trial judge was called to the failure to prove the charge in the indictment against Murtland; he said that he had no doubt that a conspirator might withdraw, but that the facts and circumstances surrounding the withdrawal might make it necessary to have a jury pass upon the question. With this we agree. He did not, however, submit to the jury the question whether Murtland had withdrawn, although the evidence to that effect was uncontradicted and from the mouth of the detective himself. The matter is most important, in view of evidence that was objected to. Hearsay statements by Phoebus to Murtland's detriment, made several weeks thereafter, and at a time when exposure had already come and Phoebus had "confessed," were admitted. We need not dwell on the danger of admitting,

under such circumstances, hearsay evidence of statements by a man who, at best, was an accomplice, and may have been a stool-pigeon. The importance for the present purpose is that the evidence was admitted on the theory that the conspiracy continued until Murtland got the compensation for which he had bargained. The Supreme Court in vindicating the admissibility of the hearsay report of Phoebus' statements, said that the conspiracy contemplated a contract to be given out under the ordinance for the work to be done, from which contract Murtland was to derive a personal benefit. Now if Murtland had distinctively repudiated the alleged contract for $500 as seems undisputed, the joint relations between him and Phoebus certainly ceased as soon as the ordinance was passed, and hearsay evidence of what Phoebus said thereafter would be inadmissible. If Murtland entered into a new conspiracy with Reed alone involving a different compensation, Phoebus was not a co-conspirator in that and hearsay testimony of his statements would be inadmissible. We are not to be understood as holding that the testimony as to Phoebus' statements on May 31st was admissible under any aspect of the case. It was surely not admissible if Murtland had withdrawn from the conspiracy as charged prior to the overt act. The error was emphasized by the judge's charge. He called attention to Murtland's failure to testify. Murtland could not deny the fact that Phoebus had made the statement to Reed, since he was not present; it would have been idle for him to deny the truth of what Reed said Phoebus had said until there was other proof that he and Phoebus were co-conspirators; and he was not called on to deny Reed's testimony as to their conversation, since that tended to prove, if it did not prove, that he was no longer in the conspiracy charged in the indictment, and rendered inadmissible the evidence as to what Phoebus said thereafter. The harmfulness of the admission of this hearsay testimony is shown even more clearly by the fact that if Phoebus had appeared as a witness, he would not only have been sworn as such, but the defendants would have had the usual opportunity to cross-

examine, and the trial judge would undoubtedly have cautioned the jury against the acceptance of the testimony of an accomplice like Phoebus who had turned state's evidence, for he was none the less an accomplice and had none the less turned state's evidence because his testimony was reported in the form of mere hearsay and even then came only from the mouths of hired detectives who had themselves originated the conspiracy of which they were trying to convict the defendants.

Both defendants were entitled to be acquitted. The judgment must be reversed and the record remitted, to the end that a *venire de novo* be awarded.

We ought to add a word of caution. We must not be supposed by our silence to indicate approval of the view expressed by the Supreme Court as to the meaning and effect of our ruling in Bullock *v.* State as to the withdrawal from the jury of evidence improperly admitted. It will be time enough for us to pass upon that question when it is necessarily involved. The same caution should be given as to the admissibility of testimony as to what Phoebus said before the alleged conspiracy was brought about and while Phoebus' status was wholly that of an agent of Harris in the attempt to get the defendants to conspire.

MINTURN, J. (concurring).

While I concur in the view expressed in the majority opinion, as to the illegality of this conviction, my views lead me to a reversal, upon the more fundamental ground that a conspiracy organized, doubtless with the best motives, by the prosecuting officers of the law, to create a fictitious conspiracy, to entrap public officers into the commission of crime, is *contra bonos mores,* and against sound public policy.

At the basis of our jurisprudence are certain well-defined maxims, borrowed from the civil law, upon which the relative rights and duties created and imposed by law rest in their application to the individual. Among these is *volenti non fit injuria,* which denies a remedy to one who is the superinducing cause of his own injury, upon the theory that he

cannot properly complain of an alleged wrong or injury which he has invited upon himself.

It presents the fundamental concept of the doctrine of contributory negligence, and regulates and controls in daily application the rights of individuals.

The majority opinion cites instances where fundamentally, this principle was the cause of the court's refusal to recognize an alleged crime thought out and committed by one upon himself for an ulterior purpose. *Rex* v. *MacDaniel, Fost. C. L.* 121; *O'Brien* v. *State,* 6 *Tex. App.* 665; *Whart. Cr. L.* 389.

So the civil law maxim, *ex dolo malo non oritur actio,* has supplied our courts of law and equity, with a basic principle regulative of the affairs of the individual in his business transactions, and which reduced to its simplest terms has become a common law axiom, that "fraud vitiates everything."

Chief Justice Wilmot, in *Collins* v. *Blautern,* 2 *Wms.* 341, referring to the public policy inherent in this maxim, says, "the manner of the transaction was to gild over and conceal the truth, and whenever courts of law see such attempts made to conceal such wicked deeds they will brush away the cobweb varnish, and show the transactions in their true light." And again, "this is a contract to tempt a man to transgress the law to do that which is injurious to the community. It is void by the common law, and the reason why the common law says such contracts are void is for the public good. *You shall not stipulate for iniquity.* All writers upon our law agree in this —'that no polluted hand shall touch the pure fountains of justice.'" See, also, *Paxton* v. *Popham,* 9 *East* 408; *Pole* v. *Harrobin, Id.* 417; *Gas Light Co.* v. *Turner,* 5 *Bing. N. C.* 666; *Cuthbert* v. *Haley,* 8 *T. R.* 390, and cases cited in *Broom Leg. Max.* 659.

If these basic conceptions of law are to govern courts in the administration of law and equity, as between the people, upon what theory of consistent legal procedure it may be asked, is their application to be halted, when the state presents itself as a litigant at the bar? Except upon the ex-

ploded theory that the state can do no wrong, I know of no principle of extenuation or exception, which can be held to relieve the state as the fountain head of justice, from the effect of the application of its own laws.

The cases which are reported, both in support of such action of the state and those opposed to it, serve to indicate the extent of which this practice has been indulged, upon the theory that if a conspiracy can be concocted to induce officials, apparently quiescent and noncommittal, to violate the law, the courts *pro bono publico*, will recognize the legality of the act and impress a judicial *imprimatur* upon it.

The concoction of such a scheme is unnecessary to prove its purpose, viz., that some men are mercenary and venal. Criminal law is enacted upon the theory that such men exist. The dormant energy for transgression, more or less smouldering in human breasts, awaits only the opportunity presented by a more acute, energetic and subtle mind, supported by the apparent respectability, character and social standing of the tempter, to produce the leap that blasts hope and character, and spells moral destruction in an abyss of remorse and shame.

Cases from individual states cannot in my judgment moralize or legalize such procedure upon any laudable theory of public policy.

Rome applied it in the days of her disintegration. Richelieu made it a method of procedure to support his policies, and some modern states of Europe have tried it as a method to foment crime and blast it in its inception, in order to anticipate popular insurrection. We have tried it where crime was conceded to exist, as in the cases of post-office larcenies, and where the purpose was to ensure the trapping of the guilty one. But except upon the universally condemned notion of the mediæval casuists, that the end may justify the means, no support for the situation here presented can be extracted from the recognized maxims of the law, or from the fundamental concepts of moral philosophy, or from the precepts of the decalogue upon which such maxims in the last analysis are presumed to be based.

*For affirmance*—THE CHANCELLOR, TRENCHARD, BLACK, HEPPENHEIMER, WILLIAMS, JJ.   5.

*For reversal*—GARRISON, SWAYZE, BERGEN, MINTURN, TER-HUNE, TAYLOR, JJ.   6.