[Crim. No. 652.   Third Appellate District.—February 23, 1923.]

## THE PEOPLE, Respondent, v. SEGUNDIO RODRIGUEZ, Appellant.

[1] CRIMINAL LAW—CONSPIRACY TO COMMIT BURGLARY—SUFFICIENCY OF EVIDENCE.—In this prosecution for conspiracy to commit the crime of burglary, the evidence clearly warranted the jury in finding that the crime of conspiracy, as defined by our statute, was consummated.

[2] ID.—INFORMATION—ATTEMPT TO PICK LOCK TO EFFECT ENTRANCE —SURPLUSAGE.—An allegation in an information charging a conspiracy to commit the crime of burglary that the defendant attempted to pick the lock of the door of the office of the mining company proposed to be burglarized merely involves a statement of the means employed and is mere surplusage.

[3] ID.—CONSPIRACY TO COMMIT BURGLARY—SUFFICIENCY OF INDICTMENT.—A conspiracy to commit the crime of burglary is sufficiently charged in the language of the statute and the means employed for that purpose is not material and need not be alleged.

[4] ID.—OVERT ACT—ATTEMPT TO ENTER OFFICE—SUFFICIENCY OF INFORMATION.—An information charging a conspiracy to commit burglary which alleges the formation of the conspiracy and the attempt to enter the office of the company proposed to be burglarized sufficiently alleges the overt act.

[5] ID.—ORIGINATOR OF CRIME — FEIGNED ACCOMPLICE — EVIDENCE — SUFFICIENCY OF CORROBORATION.—In a prosecution for conspiracy to commit burglary, the suggestion in a letter from one conspirator to another that a feigned accomplice was the originator of the crime was sufficient corroboration of the latter's testimony that the defendant was the originator, assuming that this witness was a real accomplice.

[6] ID.—CONSPIRACY TO ROB MINE—FEIGNED ACCOMPLICE—KNOWL-EDGE OF MINE OWNERS—EFFECT OF.—Where one who had been invited to join in a conspiracy to rob a mine reported the matter to the mine owners, who did not object to his proposition to join the conspirators for the purpose of capturing them and bringing them to justice, there was no tacit consent in law to the commission of the crime or wrongful entrapment of the conspirators.

[7] ID.—EVIDENCE—CONFESSION OF DEFENDANT—EFFECT OF SUBSE-QUENT TESTIMONY.—In a prosecution for conspiracy to commit the crime of burglary, the admission of a confession of the defendant made upon the advice of the feigned accomplice, even if erroneous, was without prejudice, where the defendant himself took the witness-stand and repeated substantially such confession by admitting that he was a party to the conspiracy and that he with his co-conspirators went to the mining office for the purpose of burglarizing it.

[8] ID.—CONVICTION OF DEFENDANT—PROOF OF OVERT ACT—INSTRUC-TION.—In a prosecution for conspiracy to commit the crime of burglary, an instruction in the language of section 184 of the Penal Code is not subject to the objection that thereby the jury were told in effect that any overt act which they might find from the evidence was done by the defendant and his confederates in furtherance of the conspiracy would be sufficient, even though such act was not the overt act specifically charged in the information, where it was immediately followed by an instruction substantially in the language of section 1104 of such code that upon a trial for conspiracy, the defendant cannot be convicted unless one or more overt acts are alleged in the information, nor unless one of the acts alleged is proved.

[9] ID.—FRUSTRATION OF CONSPIRACY—EFFECT OF ACTS OF DETEC-TIVES—INSTRUCTIONS NOT CONTRADICTORY.—An instruction that a defendant in a case of conspiracy under section 182 of the Penal Code cannot escape conviction merely because the party designed to be affected or injured thereby or his agents, by laying a trap or otherwise, have facilitated the accomplishment of the purpose of the conspiracy, or because such party or his agents have appeared to co-operate with the originator of the conspiracy in order to detect the conspirators in any attempt

6. Instigation or consent to conspiracy for purpose of detecting criminal as defense to prosecution, notes, 18 A. L. R. 158; 25 L. R. A. 341; 30 L. R. A. (N. S.) 946; 51 L. R. A. (N. S.) 825.

7. Confession procured by artifice or fraud, notes, 15 Ann. Cas. 274; Ann. Cas. 1916D, 966; 18 L. R. A. (N. S.) 840; 50 L. R. A. (N. S.) 1088.

they might make to accomplish the object of the conspiracy is not inconsistent with an instruction that where there exists a suspicion that a crime is about to be committed, while it is proper to employ detectives or agents to watch and discover the persons proposing to perpetrate it, still, if the agents or detectives so employed suggest the commission of the crime to the suspected persons or mingle with the latter and while so doing induce, urge, or instigate such persons, there can be no prosecution and conviction.

[10] ID. — PROOF OF CONSPIRACY—JOINDER OF LESS THAN NUMBER CHARGED — EFFECT OF—INSTRUCTION.—An instruction declaring that the defendant could be convicted if the proof satisfactorily showed that the conspiracy to do the act charged was entirely between the defendant and one of the other of the four persons jointly charged in the information is not subject to the objection that it does not state the conspiracy charged.

[11] ID.—VARIANCE BETWEEN PLEADING AND PROOF—RULE WHEN INAPPLICABLE.—The rule as to a material variance between the pleading and the proof has no application where, in a criminal case in which two or more persons are jointly charged with the same crime, the evidence may be such as to justify the conviction of some of the defendants only and to require the acquittal of the others.

[12] ID.—STATUS OF PARTICIPANT—QUESTION FOR JURY.—In a prosecution for conspiracy to commit the crime of burglary, it is for the jury to say from the evidence whether a participant in the crime was an agent or detective of the party intended to be burglarized.

[13] ID.—CHARGE AGAINST SEVERAL CONSPIRATORS—DISMISSAL AS TO ONE—EFFECT OF.—The dismissal of an information as to one of four persons charged with a conspiracy does not entitle the others to an acquittal.

APPEAL from a judgment of the Superior Court of Nevada County and from an order denying a new trial. George L. Jones, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. E. Wright and Russell P. Tyler for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was convicted of conspiracy to commit the crime of burglary (sec. 182, Pen. Code, as

amended by the legislature of 1919, Stats. 1919, p. 170), upon an information charging: That he "on or about the 16th day of March, 1922, . . . , willfully, unlawfully and feloniously did conspire and agree with C. Silbelo, Vincent Alvarez and Albert Greenwald to commit the crime of burglary, to-wit: By then and there feloniously to burglarize the office of the North Star Mines Company, a corporation, and the said Segundio Rodriguez, in pursuance and furtherance of said conspiracy, and to effect the object thereof, did attempt to pick the lock of the door of the office of the said North Star Mines Company to enter and consummate the purpose of said conspiracy," etc. The alleged conspirators, with the exception of Greenwald, who was a feigned accomplice, were given separate trials. The defendant appeals from the judgment and the order denying him a new trial.

The legal integrity of the verdict is assailed on several different grounds, the first of which is that Albert Greenwald, charged in the information as a co-conspirator, was the agent of the North Star Mines Company and as such was employed and directed to originate a scheme whereby the other alleged conspirators would be inveigled and so entrapped into an attempt to burglarize the office of said company for the purpose of abstracting therefrom and stealing a large quantity of bullion stored therein. In other words, it is the contention that the conspiracy charged was, in pursuance of an agreement previously made between said Greenwald and the officers of said company, originated by the former and that he led the other defendants into the scheme and in an attempted execution thereof; that, therefore, the arrest, the prosecution and the conviction of the defendant were the result of an "entrapment," as that term is in criminal law understood, and that for that reason and for the further reason that the scheme was concocted and sought to be carried out with the consent of the officers of the mining company, no crime was committed, and, consequently, the conviction of the accused is opposed to public policy and, consequently, void. It is further contended that the verdict should be set aside because of certain errors committed in rulings upon certain evidence and also because of errors in the giving of and refusing to give certain instructions.

It appears from the evidence that Albert Greenwald is a machinist by trade and an expert locksmith; that he maintained a machine-shop in the town of Grass Valley, in Nevada County; that in January, 1922, while engaged in doing some work in a restaurant in Grass Valley, he met the defendant and that they then engaged in a conversation in the kitchen of said restaurant; that during the course of the conversation defendant stated to Greenwald that he at one time was engaged at working in a mine in Montana, that he had seen there some high-grade ore and that he had tried to open the lock but could not, ''and that if he knew how to open Yale locks he would never work again''; that he subsequently met the defendant on three or four different occasions and conversed with him and that the latter on one occasion asked him how much he would charge to teach a friend of his (defendant's) to open Yale locks. Greenwald asked the defendant what his purpose was in having his friend learn how to open Yale locks, to which the defendant replied that ''there is so much easy money to be gotten all over the country, and if I had a partner, a friend who could open Yale locks, I would never work any more.'' Greenwald tried to dissuade the defendant from engaging in any such business, as ''practically he would be plotting against government property,'' the defendant having in the conversation named a number of places, including postoffices, that could be easily entered and money taken therefrom if someone of experience in the opening of Yale locks would undertake the work with him. The defendant was insistent upon having Greenwald teach his friend how to open Yale locks and wanted to know what the latter would charge for so instructing his (defendant's) friend. Greenwald finally said that he would charge the sum of two hundred dollars for instructing the party referred to as to the method of opening such locks. Greenwald testified that in the month of February he closed his shop in Grass Valley and removed his mechanical equipment to Rocklin; that before departing from Grass Valley the defendant requested him (Greenwald) to leave his address with the defendant and that, having done so, he later received from the defendant a letter in which it was stated that his (defendant's) friend would soon be in Rocklin for

the purpose of taking lessons in the business of opening Yale locks. Shortly after Greenwald received the letter referred to, Vincent Alvarez (sometimes referred to in the testimony as Alvarez Rodriguez), one of the alleged co-conspirators named in the information, made his appearance at the former's shop in Rocklin and introduced himself as the party of whom the defendant had spoken and written to him (Greenwald) as desiring to learn something about opening Yale locks. Greenwald gave Alvarez some instructions as to how to manipulate Yale locks so as to open them, but testified that he did not impart sufficiently explicit information in that particular to Alvarez to enable him to completely open such locks. A short while after the time just referred to, Greenwald moved back to Grass Valley, and on the second day of March again met the defendant in the company of Alvarez. It was on this occasion that the defendant proposed to rob the Empire and North Star Mines, Alvarez being present, but not taking any special part in the conversation. The scheme was elaborately discussed by the defendant and he asked Greenwald to join in the criminal enterprise, but Greenwald at this time neither gave his assent to nor expressed dissent from the proposition. It was first suggested by the defendant that they take the bullion from the truck which is employed in conveying the same at certain intervals of time from the mines to the railroad station to be shipped. Greenwald would not agree to this suggestion. The defendant thereupon suggested that the bullion be taken from the train, but as to this Greenwald expressed no opinion. The defendant, Alvarez, and Greenwald met on several subsequent days and on each of these occasions the proposition of robbing the mines was renewed by the defendant. Finally it was agreed that they would go to the office of the North Star Mines, break into it, and steal the bullion.

On the 8th of March, 1922, Greenwald called on a Mr. Nobs, general manager of the Empire Mines Company, and gave him the full details of the proposed scheme of the defendant and Alvarez to rob the Empire and the North Star mines. Nobs in turn communicated the information thus received to Mr. Foote, the general manager of the North Star Mines Company, and these two told Mr.

R. H. Bedford, the general superintendent of the North Star Mines Company, of the proposed robbery. Mr. Nobs stated that when Greenwald first told him of the proposed robbery, he was rather skeptical about it for the reason that many other such reports had frequently come to them theretofore and proved to be groundless; that in those instances such reports were made by persons who desired to secure money from the mining companies for giving them the information and before producing results. He said, however, that, after consulting with the officers of the North Star Mines and further questioning Greenwald, who appeared at the offices of the mining companies three or four times before the robbery was attempted, he came to the conclusion that there was some foundation for the story. The services of a Mr. DePue of San Francisco, a noted finger-print expert and investigator of crimes, were brought into requisition by the officers of the North Star Mines and the matter was placed in his hands. On his arrival at Grass Valley and at the office of the North Star Mines, Greenwald was sent for and in the presence of Mr. Nobs, DePue questioned Greenwald very fully as to the details of the proposed robbery. DePue thereupon reached the conclusion that Greenwald was acting in good faith and was truthful in the story he told relative to the proposed robbery. Greenwald was asked by Mr. Nobs how much he wanted for furnishing the information, to which Greenwald replied that what he wanted first was to prove that what he had told them was true; that the defendant and his co-conspirators were bent upon robbing the North Star Mines Company office and securing the bullion therein deposited; that if he succeeded in proving the truth of what he had told them, the mining company could pay him whatever it thought his services were worth. Thereupon DePue stated that if the story he had told them proved to be well founded, it would be worth at least one thousand dollars to receive such information and Mr. Nobs assented to that proposition.

After Greenwald first imparted information to the authorities of the mines of the proposed robbery, Silbelo, also charged as a co-conspirator, was brought into the affair by the defendant, the latter having previously told Greenwald that he had another friend, referring to Silbelo, who would

enter into the conspiracy. Defendant stated that he had "tried out" said Silbelo "and that he wouldn't stop at anything and that he wanted him to go in with them on the hold up." After Silbelo put in an appearance as a member of the confederation, the matter of the robbery was freely and fully discussed by the defendant, Alvarez, Silbelo, and Greenwald, the latter finally agreeing to become a party to the commission of the proposed crime. In this connection, it should be stated that when Greenwald first told the officers of the mining companies of the intended robbery, he stated that the conspirators had asked him to join them in the scheme and that he intended doing so for the purpose of assisting in their detection and apprehension. He was advised by the officers of said companies to go ahead and do what he could toward bringing the conspiracy to light and capturing the criminals, if such they were.

The time fixed for the execution of the conspiracy was the night of the 16th of March, 1922. Greenwald so informed the officers of the North Star Mines. The latter had several deputy sheriffs in addition to the regular watchman of the mine stationed inside the building on the night of the 16th for the purpose of frustrating the accomplishment of the conspiracy and capturing the conspirators. On that night the attempt to rob the mine was made. Greenwald accompanied the other three parties to the office of the mine. They were all armed with weapons which, during the period of time the conspiracy was under discussion between the parties, were purchased by the defendant and Silbelo at a hardware store in the city of Auburn, Placer County. When they arrived at the mine the defendant, who had constituted himself the leader in the scheme, assigned each of the conspirators to certain particular duties. Two were to be stationed at different points near the building so as to give alarm if anyone should put in an appearance. Two of them were to go to the office door and undertake to open it. Greenwald testified that this arrangement was carried out. The defendant stationed himself near a tree which was close to the building and Silbelo was at another point not far distant from where the defendant stood. The latter ordered Silbelo "not to stop at anything" if anyone should appear on the scene

while they were engaged in the robbery. Alvarez and Greenwald went up to the office door, Alvarez being the first one to get to the door and to take hold of the knob and attempt to open it. Greenwald followed and turned the knob and made a noise with a pick that he put in the door. A noise from another source was also heard. Greenwald was not certain whether it was produced by someone inside the office or by one of the conspirators. Greenwald then returned to where the defendant stood and stated that "the building was bolted on the inside and I couldn't open the door," and referred to the noise he had heard. A suggestion was then made that they desist in any further attempt to break into the office that night, but the defendant, notwithstanding that he was told by Greenwald that he had heard a noise which might have come from the office or the inside of the building, proposed that they break the window and thus make an entrance into the office. It was, however, finally agreed that they would not make any further attempt to burglarize the office that night and they returned to Greenwald's shop.

Nobs and Bedford positively testified that Greenwald, prior to the time at which he first gave them information relative to the proposed robbery, was not employed by either the Empire Mines Company or the North Star Mines Company in any capacity; that at no time did they authorize him to lead the defendants into a scheme to rob the mines or to accompany the conspirators to the mines for the purpose of robbing the same. They admitted that after he had told the story to them and had stated that the other parties desired him to go with them to the mine for the purpose of robbing it, they advised him to "go ahead." This is positively all that was said to Greenwald in regard to the matter, so they testified. They had no contract with him whereby he was to receive any particular sum of money for his services, except any agreement which might be implied from the suggestion of Mr. DePue, with the acquiescence of Mr. Nobs, that the services of Greenwald would be worth one thousand dollars if it proved to be true that a conspiracy had been formed by and between the defendant and his co-conspirators to burglarize the office of the North Star Mines for the purpose of stealing the bullion therein stored. In fact, both

Nobs and Bedford positively testified that at no time could they get Greenwald to say how much he wanted for his services; that Greenwald, in reply to the question as to how much he would charge for his services, would invariably say that he had no price to fix, that what he desired, above all other considerations, was to show that the defendant, Alvarez, and Silbelo had suggested and formed a conspiracy to rob the mines and to have them apprehended in the act. It was admitted by Mr. Bedford that, on the suggestion of Mr. DePue, he gave Greenwald twenty-five dollars to be used for defraying any expense to which he might be required to go in bringing about the apprehension of the conspirators if they attempted to carry out the object of the conspiracy.

DePue testified, in response to questions on cross-examination, that he did not instruct or direct Greenwald to accompany the other men to the mine on the night of the 16th; that there was no necessity for him doing so because Greenwald had himself said that he intended to go with the men upon his own initiative, so that he could prove to the satisfaction of the mining company that he had told them the truth regarding the conspiracy.

The defendant and his co-conspirators, including Greenwald, were placed under arrest by Sheriff Martin, of Nevada County, in the locksmith-shop of Greenwald in Grass Valley on the evening of March 29, 1922. It seems that there was not room enough in the Nevada County jail to hold the prisoners and they were taken to the county jail at Auburn, Placer County, to remain pending their preliminary examination and trial. While they were confined in said jail the defendant made a statement to Mr. DePue in the presence of Sheriff Gum, of Placer County, R. C. O'Connor, and Greenwald, in which he admitted that he, Alvarez, Silbelo, and Greenwald had entered into the conspiracy to rob the North Star and Empire Mining companies and that they undertook to carry out the conspiracy on the night of the 16th of March, 1922, as explained by Greenwald in his testimony. DePue, Gum, and O'Connor positively testified that the defendant at no time during the course of his confession stated that Greenwald planned the conspiracy or was the instigator thereof. These witnesses testified that the defendant said that they had taken

Greenwald with them because he was an expert locksmith and could be of service in opening the locks of the office and the vault in which the bullion was kept.

The defendant, testifying in his own behalf, admitted that he and the other parties named in the information conspired together for the purpose of robbing the North Star and Empire mines; that they undertook to carry out the conspiracy on the night of the 16th of March, 1922, but, as Greenwald testified, they heard some noises which put them in fear that they were being watched and thereupon withdrew from the premises of the North Star Mines without having entered the office or, as he stated, without attempting to rob it. The defendant stated that he first met Greenwald in February, 1922, in a restaurant which he (defendant) was conducting in Grass Valley; that they met several times thereafter and that Greenwald frequently complained of the fact that his business (that of a machinist and locksmith) was not paying him as well as he would like, and, on one occasion, suggested to the defendant that if he (defendant) had any friend who desired to learn the business of a locksmith or how to open locks, he would teach him the art for the sum of $50; that when Greenwald left for Rocklin he gave his address to the defendant, with instructions to send anyone to him who might desire to learn how to open Yale locks; that he did later send Alvarez to Greenwald at Rocklin with a letter stating that Alvarez desired to learn how to open Yale locks; that upon his return to Grass Valley from Rocklin, Greenwald again met the defendant and, after considerable conversation about "hard times," so far as his business was concerned, and also asking where Alvarez was at that time, made a proposition to the defendant to rob the North Star and Empire mines. This conversation occurred, so defendant stated, between the 8th and 10th of March, 1922, in the room of Greenwald in Grass Valley. Thereafter, proceeded the defendant, he, Alvarez, Silbelo, and Greenwald again met and fully discussed and finally completed the plans for robbing the North Star Mines, Greenwald being the man who suggested and arranged for the carrying out of the scheme. The defendant admitted that, as a part of the preparation for executing the object of the conspiracy, he and Silbelo bought several revolvers

to be used by them on the night of the robbery. These revolvers were purchased at a hardware store in Auburn, so the defendant testified, and so testified the owner of the hardware store, who identified the weapons as those sold to two strangers on the day on which the defendant admitted that they were purchased.

Alvarez, one of the alleged confederates of the defendant, was called to the stand to testify in behalf of the defendant, but, having been informed by the court of his rights as a codefendant, refused to testify on the ground that his testimony would tend to incriminate him.

[1] 1. There can be no doubt but that the evidence clearly warranted the jury in finding that the crime of conspiracy, as defined by our statute, was consummated. (See sec. 182, Pen. Code, *supra*.) Section 184 of said code, as amended by the legislature of 1919 (Stats. 1919, p. 170), provides: "No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within this state to effect the object thereof, by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act may be done."

[2] The information alleges that the defendant attempted to pick the lock of the door of the office. This, of course, charged an act in furtherance of the execution of the conspiracy, as required by section 184 of the Penal Code. As seen, the evidence shows that Alvarez one of the co-conspirators, went to the door and got hold of the knob. There is no direct testimony that he actually attempted to pick the lock, yet the evidence shows he had with him lock-picks and pass-keys and it seems to us that the jury were, from this fact and the fact that he took hold of the knob of the door, authorized to infer and conclude that he did actually pick the lock or do some other like act for the purpose of opening the door. But, after all, since the gravamen of the offense as charged in the information is the formation of the conspiracy and the attempt to enter the office of the mining company, the allegation that the conspirators attempted to pick the lock of the door of the office merely involves a statement of the *means* employed by them to effect such entrance and in a rational view amounts only to an allegation that they attempted

to open the door for the purpose of facilitating their entrance into the office. Indeed, the allegation that the conspirators attempted to pick the lock of the door would be meaningless if it were not used in the information for the purpose of expressing the idea or thought that they thus attempted to make an entrance into the office. Any attempt on the part of the conspirators to enter the office and to "consummate the purposes of the conspiracy," which is the language of the information, whether the attempt was made by breaking the door or a window or picking the lock of the door or by attempting to open the door by means of a pass-key, would constitute the overt act charged in the information as in furtherance of the conspiracy. [3] To be more explicit, in charging the crime of burglary it is sufficient to allege that the accused unlawfully, etc., entered a certain building or structure with the intent to commit grand or petit larceny or any felony, without stating the means employed by him to effect an entrance, and an attempt to commit that crime is sufficiently charged in like language—that is, in the language of the statute. And it follows, therefore, that the means employed for that purpose is not material, and need not be alleged. It is mere surplusage. With the allegation as to the picking of the lock omitted from the information, the charge would thus be sufficiently stated: " . . . did conspire . . . to commit the crime of burglary, to-wit: by then and there feloniously to burglarize the office of the . . . company and the said [defendant], in pursuance and furtherance of said conspiracy and to effect the object thereof did attempt . . . the office of . . . company to enter and consummate the purpose of said conspiracy." Thus, in effect, or substantially does the information here charge the offense and it was, therefore, sufficient, in order to meet the allegation of that pleading as to the overt act, to wit, the attempt to enter the office of the mining company, to prove that the conspirators did make such attempt, the means resorted to by them for that purpose being unimportant and immaterial.

[4] In the recent case of *People* v. *Beck*, 60 Cal. App. 417 [213 Pac. 61], the question as to what constitute overt acts which are required to be shown before the crime of conspiracy is established is reviewed and many cases cited in

which are to be found illustrations of different acts which are in furtherance of the execution of the object of a criminal conspiracy or which, if done, would effect or tend to effect the object of the conspiracy. But there cannot, of course, be any question but that an attempt to open the door of the office, whether by picking it or otherwise, is an overt act. Manifestly, the act of Alvarez in attempting to enter the office was the act of all the conspirators, since it was made for the purpose of accomplishing the object of the conspiracy.

[5] 2. There is a conflict between the testimony of the defendant and that of Greenwald upon the question whether the conspiracy was originated by the latter or by the former and the other alleged conspirators. There is, however, some evidence corroborative of the testimony of Greenwald that the conspiracy was instigated by the defendant and not by him. While both the defendant and Silbelo were in jail, awaiting trial, the defendant wrote and sent to Silbelo a letter in which he suggested that he (Silbelo) admit his guilt, but, in making his confession to the officers, to state that Greenwald was the originator of the scheme to rob the mine and induced the defendant, Silbelo, and Alvarez to join him in the formation and execution thereof. This story need not have been put in the mouth of Silbelo by the defendant if the truth was that Greenwald originated the conspiracy, and, therefore, the suggestion in said letter that Silbelo should say to the officers that Greenwald was the originator of the crime is a very strong circumstance tending to support Greenwald's testimony that the defendant was the prime mover or instigator of the conspiracy. This, we think, was sufficient corroboration of Greenwald's testimony as to that matter, assuming that he was a real accomplice and that it was necessary that his testimony in that particular be corroborated as required by section 1111 of the Penal Code. [6] There is no evidence and no claim that Greenwald was an officer of the law or anything other than a mere private citizen, and since, also, it is clear that there is abundant support to the implied finding of the jury that Greenwald did not, in the transaction involving the formation of the conspiracy and the attempted execution thereof, act as a detective for or the agent of either the North Star or the Empire Mines Company, and

that the officers of neither company consented to or urged either the formation or the execution of the conspiracy. As to the part taken by the officers of the North Star Company in the transaction, we are justified in saying that there is no evidence whatever that those in authority over said company ever suggested or advised the formation of the conspiracy. Indeed, from the evidence it is clear that the officers of the company knew absolutely nothing of any' scheme being in progress to rob the company until Greenwald communicated information of the proposed robbery to them, and that they did not then consent to the commission of the burglary but merely consented to anything Greenwald might find it necessary to do to expose the conspiracy and to capture the conspirators. At the time they received information of the formation of the conspiracy there was wanting in the consummation of the crime charged in the information but one element, to wit, some overt act or acts on the part of the conspirators in furtherance of the object of the conspiracy; and the evidence does not show that the officers of the mine, or anyone having authority in the matter of the investigation of the proposed robbery, induced or requested Greenwald to proceed in confederation with the other parties with the execution of the object of the conspiracy or to do any act in furtherance thereof. It will be remembered that the officers testified that Greenwald stated to them that he had been invited by the defendant and his confederates to join them in the conspiracy and to accompany them to the office of the company for the purpose of carrying out the object thereof. It is true the officers made no objection to the proposition of Greenwald to join the conspirators in the actual attack upon the property of the company, and this, it may be conceded, may be considered as a tacit consent on the part of the officers that he should do so; but this does not amount to consent in law. It merely means (in view of the evidence generally) that, having been informed that certain criminals had fixed upon a determined purpose to rob them of their property, they were willing that their informant should pursue any course that would prevent the accomplishment of the designed result of the criminal combination and to bring the criminals to justice. In 25 Cyc., page 44, the rule is stated as follows: ''The fact that an

agent of the owner acts as a supposed confederate of the thief is no defense to the latter, provided the original design was formed independently of such agent. So where a detective employed by the owner acts with the thief, the taking is none the less larceny. And so, where a person approached by the thief as his confederate notifies the owner or the public authorities, and, being authorized by them to do so, assists the thief in carrying out the plan, the larceny is nevertheless committed.''

In *State* v. *Currie,* 13 N. D. 655 [112 Am. St. Rep. 687, 69 L. R. A. 405, 102 N. W. 875], it was held, quoting the *résumé* of the opinion as given in footnote to *State* v. *Smith,* 30 L. R. A. (N. S.), page 951: ''It is no defense to a prosecution for burglary, that one present with and as-sisting defendant in the burglary was a detective, if the detective did not instigate the crime, and it was committed, as to every ingredient of it, by the defendant; nor that the owner of the building, to whom the detective disclosed that it was probably about to be burglarized by the defend-ant with the feigned assistance of himself, acting for the purpose of securing evidence of the intended burglary and other crimes, did not take steps to prevent the crime, but passively allowed it to go on.''

The rule is stated succinctly in *City of Chicago* v. *Bren-decke,* 170 Ill. App. 25, as follows: ''It is not an unlawful entrapment for police officers to afford to a person an op-portunity to voluntarily and deliberately do what they had reason to believe he would do if opportunity offered.''

The case of *State* v. *Smith,* 33 Nev. 438 [117 Pac. 19], is strikingly similar in the facts to the case at bar. The defendant was charged jointly with other persons with the crime of grand larceny in the stealing of gold amalgam from a mining company in the state of Nevada. He and his confederates attempted and thought that they had succeeded in inducing the watchman of the mine, one Zim-merman, to join them in the conspiracy to commit the crime. Zimmerman, however, reported the proposed larceny to the officers of the company and they advised him to pretend to stand in with the conspirators in the perpetration of the crime. Zimmerman did as he was so instructed and the at-tempt to rob the mine was made. The defendant and his confederates were apprehended in the act, placed under

arrest, prosecuted for and convicted of the crime. On appeal the point was made that the offense was committed with the consent of the owners of the mine through their agent, Zimmerman, but the supreme court held that the defense was not well taken. The court in its opinion reviews many cases covering the proposition of entrapment and the commission of offenses with the apparent assistance of feigned confederates, who were the agents of the owners of the property upon which the criminal trespass was designed to be made, and we refer to those cases as opposing the claim herein made by the appellant that the proposed robbery of the mine was with the consent of the owners thereof, in the sense that they were parties to or instigators of or induced the commission or the attempted commission of the crime. (See *People* v. *Bunkers,* 2 Cal. App. 197, 209 [84 Pac. 364, 370].)

Obviously, if the officers in authority over the North Star Mines Company had actually consented to the formation and the attempted carrying out of the conspiracy, then the element of criminal trespass would have been absent and no crime committed. But, as is clear from the evidence, this is not such a case. Nor does the case here come within the rule of that class of cases of which the case of *People* v. *Collins,* 53 Cal. 185, is an exemplar. In that case the defendant asked one Parnell to enter a certain building for the purpose of stealing therefrom a sum of money which he (defendant) knew to be concealed therein and proposed that the money should be divided between them. Parnell, before accepting or acting upon the proposal, communicated the fact of its having been made to him to the sheriff, who, after consultation with the district attorney, advised Parnell to pretend to the defendant that he accepted the proposition and would carry out the enterprise. The understanding between Parnell and the sheriff was that the former, upon taking the money, should mark it with acid, so it could be identified, and when he delivered the money to the defendant a signal should be given by Parnell upon which the sheriff would arrest the defendant with the marked money in his possession. Parnell, it seems, entered the building and secured the money, the defendant remaining on the outside, and when Parnell gave the money to the defendant he, at the same time, gave the signal agreed upon

and the sheriff thereupon arrested the defendant with the marked coins in his possession. Manifestly, since the gist of the crime of burglary is the entering of a building with intent to commit certain crimes, and Parnell not having entered the building with such intent, the crime of burglary could not be consummated. The supreme court so held and reversed the case. Here Alvarez, one of the conspirators, was himself the first to attempt to enter the office.

[7] 3. The particular criticism of the court's rulings as to the evidence involves the action of the court in allowing to go before the jury the confession of the defendant. The ground upon which the objection was urged below and is pressed here against the propriety of this testimony is that, prior to the making of the confession, Greenwald had attempted to induce the defendant to confess and had said to him that it would be better for him if he would tell the truth about the matter. The claim is that it was under the stress of the advice so given to the defendant that the confession to the officers was brought about and that it was, therefore, not a free and voluntary admission of guilt. There is some conflict as to whether the confession was thus superinduced. It is very clear, though, that any advice given by Greenwald to the defendant to admit his guilt was not in the presence of any officer or person in authority. Nor does it appear that the circumstances under which Greenwald is supposed to have advised the defendant to tell the truth were such as would have led him (defendant) to believe that such advice was given with the sanction of any person in authority or having power to extend leniency to him in the matter of punishment in case he did confess. In the case of *People* v. *Luis*, 158 Cal. 185, 191 [110 Pac. 580, 582], considering the ruling of the trial court admitting in evidence a confession made by the defendant upon the advice of a third party, who was not an officer or in authority, that it would be better for him to do so, the supreme court says: "We are aware of no case holding that a confession should be excluded merely because it was induced by the advice of a third person to the effect simply that it would probably be better to tell the truth, given in the absence of any officer or person in authority, and not given under such circumstances as to lead the accused to suppose it was given with the sanction of any such person.

The mere fact that the accused secretly hoped that the effect of making a complete statement showing his guilt would be to lighten his punishment and make it better and easier for him could not operate to render the statement inadmissible if that hope was not improperly induced. It is manifest that the statement may be free and voluntary notwithstanding the existence of such a hope.'' (See *United States* v. *Stone*, 8 Fed. 232, 260; *People* v. *Piner*, 11 Cal. App. 549 [105 Pac. 780].)

The record shows that the defendant's confession to the officers was not made under the influence of any threats or promise of leniency or reward by said officers. Before making his confession the defendant was informed of his rights by the officers and explicitly told that any incriminating statement he might make with reference to the charge against him would be used at the trial for the purpose of supporting the allegations of the information.

But it is unnecessary further to consider this point, since it appears, as we have shown, that the defendant himself took the witness-stand and repeated substantially before the jury the confession made by him to the officers in the county jail at Auburn. In other words, he admitted, on the witness-stand, that he was a party to the conspiracy and that he, with his co-conspirators, went to the office of the North Star Mines Company on the night of the 16th of March, 1922, for the purpose of burglarizing it and taking therefrom any gold bullion which they might find deposited therein. In view of this testimony by the defendant himself, the ruling of the court allowing testimony of his confession, even if erroneous, is without prejudice.

4. The assignments of error as to the action of the court in the giving of and the refusal to give certain instructions are so numerous that all of them cannot be specifically noticed herein. We will, therefore, give special attention to such only of these assignments as it is thought should thus be noticed. The first objection is against an instruction which, so far as it goes, is in the language of section 31 of the Penal Code. It involves a correct statement of the law in the abstract and, manifestly, covers a principle which is pertinent to any criminal case in which two or more parties are jointly charged with the commission of the same offense.

[8]  Instruction No. 16 is in the language of section
184 of the Penal Code, hereinabove reproduced.  The ob-
jection to it is that thereby the court in effect told the jury
that any overt act which they might find from the evidence
was done by the defendant and his confederates in further-
ance of the conspiracy would be sufficient, even though
such act was not the overt act specifically charged in the in-
formation.  The instruction is, of course, a correct abstract
statement of the rule; but even if it were necessary to
concede that, taken alone, it is obnoxious to the objection
thus made against it, when it is considered, as it should
be, in connection with the given instruction (No. 17) im-
mediately following it, the reason for the objection is at
once dissipated.  Instruction 17 is substantially in the lan-
guage of section 1104 of the Penal Code and is as fol-
lows: "Upon a trial for conspiracy, the defendant cannot
be convicted unless one or more overt acts are alleged in
the information, nor unless one of the acts alleged is
proved."  The instruction in the case of *People* v. *Johnson*,
22 Cal. App. 362, 366 [134 Pac. 339], cited by the defend-
ant, is entirely at variance with the instruction here criti-
cised, viewed in connection with the succeeding instruction.
In the Johnson case, the court told the jury that it was
sufficient "if you find that one or more of the defendants
entered into an agreement with another defendant, . . . ,
to obstruct and impede the trial of said action, and that
in pursuance of said agreement *some* act was done by one
of them toward carrying the agreement into effect."  The
court of appeal, by Mr. Justice James, very properly held
that the phraseology of the instruction was such that the
jury could therefrom have deemed themselves at liberty to
find that an overt act other than any of those charged in the
information was sufficient to meet the requirements of a
verdict of guilty.

Instruction No. 18, proposed by the defendant, was given in
part and refused in part.  The part given, in effect, declared
that, where there exists a suspicion that a crime is about
to be committed, while it is proper to employ detectives
or agents to watch and discover the persons proposing to
perpetrate it, still, if the agents or detectives so employed
suggest the commission of the crime to the suspected per-
sons or mingle with the latter and while so doing "induce,

urge or instigate such suspected persons to take part in the commission of the crime or to commit some overt act for the purpose of convicting them, there can be no prosecution and conviction under such circumstances.'' The refused part of the instruction was practically a repetition but involved a less accurate statement in concrete form of the principle stated in the portion given. There was no error in modifying the instruction as indicated. At least, the defendant could not have been prejudiced thereby.

[9] There is no merit to the claim that instruction No. 19 is in conflict with or contradictory to instruction No. 18, last above considered. No. 19 is to the effect that a defendant in a case of conspiracy under section 182 of the Penal Code cannot escape conviction merely because the party designed to be affected or injured thereby or his agents, by laying a trap or otherwise, have facilitated the accomplishment of the purpose of the conspiracy, or because such party or his agents have *appeared* to co-operate with the originator of the conspiracy in order to detect the conspirators in any attempt they might make to accomplish the object of the conspiracy. The instruction, when reasonably viewed, is not inconsistent with instruction No. 18, nor is it objectionable in any sense. It is true, as the instruction in effect says, that an acquittal in such a case is not justified merely because the party against whom or whose property the conspiracy is aimed, having received information of its formation and that it is in process of execution and not being the instigator of the criminal scheme, makes such preparation for frustrating the accomplishment thereof and the detection of the conspirator as may be conceived to be required for that purpose. In this connection, we cite, in addition to the cases cited above as supporting this proposition, the following: *Hummelshine* v. *State,* 125 Md. 563 [Ann. Cas. 1917E, 1072, 93 Atl. 990]; *State* v. *Dougherty,* 86 N. J. L. 525 [93 Atl. 98]; *Commonwealth* v. *Wasson,* 42 Pa. Sup. Ct. 38. The instruction is to be considered, as presumptively the jury so considered it, in connection with other given instructions bearing upon the question of entrapment and in view of the evidence. As so considered, its true meaning—the meaning which is here ascribed to it—if not, when the instruction

is considered by itself or alone, plainly apparent, could not be misapprehended by any intelligent man or woman.

[10] Instruction No. 26, proposed by the people, was given after having been modified by the court by eliminating therefrom the name of Greenwald. The instruction, as so modified, stated that where a conspiracy among two or more persons to commit a crime is proved to exist, "any act in furtherance of the conspiracy done by one of the conspirators is the act of all the conspirators, and all are bound by it." The instruction then proceeds to say that if the jury were satisfied beyond a reasonable doubt that, on the day on which it is alleged the burglary was attempted, an agreement existed between the defendant "and either C. Silbelo or Vincent Alvarez [Greenwald's name here stricken out] to commit the crime of burglary, as charged . . . , and you are further satisfied . . . that, on the same date, . . . , while such agreement was in existence, in furtherance of said agreement . . . , either the defendant, or C. Silbelo, or Vincent Alvarez [Greenwald's name here eliminated], attempted to enter the office of . . . with intent to commit grand or petit larceny or felony therein, then you should find the defendant guilty, as charged," etc. The principal ground upon which the legal soundness of said instruction is impeached is that it does not state the conspiracy charged because the name of Greenwald was omitted therefrom, or, in other words, while the information alleges that *four* persons joined in the conspiracy, the instruction declares that the defendant could be convicted if the proof satisfactorily showed that the conspiracy to do the act charged was entirely between him and either Silbelo or Alvarez. The objection thus urged against the instruction, as well as some others not necessary to mention, is without legal force. If a dozen persons had been charged with being members of the conspiracy the jury could have properly found two guilty and the remainder not guilty, assuming that the evidence warranted such a course, and the court was authorized so to instruct the jury, which was in effect no more than the court did by the instruction in question. [11] The rule as to a material variance between the pleading and the proof has no application where, in a criminal case in which two or more persons are

jointly charged with the same crime, the evidence may be such as to justify the conviction of some of the defendants only and to require the acquittal of the others.

[12]  The defendant complains that the court seriously prejudiced his rights by refusing to give to the jury some eighteen different instructions which he proposed. We have examined these proposed but rejected instructions with painstaking care and thus have been convinced that every principle sought to be stated therein was covered by the court's charge to the jury. There was no necessity for repeating a principle or rule of law which was embraced in the court's charge. Besides, some of the instructions referred to were objectionable in that they referred to Greenwald as "*the* agent" and "*the* detective" of the North Star Mines Company in the transaction involved herein. It was for the jury to say from the evidence whether Greenwald was a detective or an agent of the mining company in said transaction.

[13]  Defendant's instruction No. 18, which was among those rejected by the court, does not state the law in so far as this case is concerned. It was to the effect that the acquittal of Greenwald or the act of the district attorney in dismissing the information as to him would entitle the defendant to an acquittal, inasmuch as "the acquittal of one defendant in an alleged conspiracy is an acquittal of all the defendants in the alleged conspiracy, whether such acquittal is by consent, design or after trial," etc. As supporting the propriety of the instruction, counsel for the defendant cite the case of *State* v. *Dougherty,* 88 N. J. L. 209 [Ann. Cas. 1917D, 950, L. R. A. 1916C, 991, 96 Atl. 56], in which there were only two persons involved in the alleged conspiracy, one of whom was a feigned accomplice and, therefore, there could be no conspiracy. Indeed, in such a case, the charge of conspiracy would be inappropriate.

We have discovered no just reason for disturbing the verdict and the judgment and the order appealed from are, accordingly, affirmed.

Finch, P. J., and Burnett, J., concurred.