STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN
PHELPS, A/K/A J.P., A/K/A JOHNNY,
DEFENDANT-APPELLANT.

Argued November 29, 1983—Decided June 25, 1984.

502

504

*Salem Vincent Ahto* argued the cause for appellant (*Taigman and Ahto*, attorneys; *Salem Vincent Ahto* and *Joseph Mezzaca, Jr.*, on the briefs).

*Arlene R. Weiss*, Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

SCHREIBER, J.

Defendant, John Phelps, a police officer, was acquitted of unlawfully conspiring with three individuals named DeMarco, Gerrizzo, and Hirtler to promote gambling and to maintain a gambling resort in violation of *N.J.S.A.* 2C:37–2, *N.J.S.A.*

2C:37–4, and *N.J.S.A.* 2C:5–2. During the trial, the court dismissed a charge of conspiracy to commit official misconduct by knowingly refraining from performing the duties of a police officer. However, defendant was convicted of misconduct in office by failing to report a gambling enterprise, contrary to *N.J.S.A.* 2C:30–2b. Defendant was sentenced to a five-year term in the New Jersey State Prison.

The key prosecution evidence consisted of (1) the composite tapes derived from wiretaps of telephone conversations between the defendant and coconspirators and between coconspirators, and (2) the bookmaker's log sheets, which reflected the transactions discussed in the taped conversations. Defendant offered no evidence.

Defendant appealed on numerous grounds. The most substantial legal issue concerned the trial court's admission of the taped statements of coconspirators under *Evid.R.* 63(9)(b), the coconspirator's hearsay exception. The Appellate Division affirmed the conviction. 187 *N.J.Super.* 364 (1983). We granted the defendant's petition for certification limited to the issue of the admissibility of statements made by coconspirators out of the presence of the defendant. 93 *N.J.* 309 (1983).

## I

The indictment was the culmination of an investigation by the Morris County Prosecutor's office of gambling activities in the vicinity of Parsippany-Troy Hills. Detective Michael Romano, who was in charge of the investigation, obtained judicial orders pursuant to *N.J.S.A.* 2A:156A–10 to tap the telephones of Angelo Gerrizzo and Thomas DeMarco, both of whom were believed to be key figures in the gambling operations. The prosecutor's investigators intercepted hundreds of telephone calls involving bets on college and professional football games. The investigators identified forty-three different persons who discussed bets with Gerrizzo by telephone. Nearly all the callers used a code name, *e.g.*, "Slicer," "Doc," "J.P."

The investigation culminated in raids of Gerrizzo's and De-Marco's apartments sanctioned by valid search warrants. During the search of Gerrizzo's apartment, one investigator received telephone calls placing bets. The police seized various notebooks documenting gambling activities, address books, and memo pads from Gerrizzo's and DeMarco's apartments. The code names and wagered amounts recorded in the books corresponded with those of the wiretapped phone calls.

Gerrizzo was the "sitter," the person who would sit by the telephone and record wagers as they were phoned in to him. Gerrizzo reported to DeMarco, the "controller," who would oversee the entire operation, including the receipt of wagers, the pay-off of successful bets, and the collection of gambling debts.

Both Gerrizzo and DeMarco resided in garden apartments located in a section of Parsippany-Troy Hills within the area patrolled by the defendant as a police officer. Defendant never reported this illegal gambling activity to his superiors. Proof of defendant's knowledge of this situation was a crucial element in the State's case. Tapes of eight telephone calls to Gerrizzo had been made by a person who identified himself as "J.P." (the initials of defendant's name, John Phelps) or "Johnny." The prosecutor presented a composite tape of seven of these calls and Detective Romano identified the voice of "J.P." or "Johnny" as defendant's.

The tapes also included twenty-seven conversations between "Bill from Bach's" (code name for William Gotshall, a bartender at Bach's Tavern in Lake Hiawatha) and Gerrizzo. During these conversations there were references to "J.P." or "Johnny." In one conversation Gotshall mentioned defendant's full name. That conversation pertained to a dispute over the balance in the gambling account shared by defendant and Gotshall. Gerrizzo quoted a figure and Gotshall insisted it should be higher. At that point Gerrizzo suggested that he review the preceding day's action.

G. Let's go over it, okay?

B. Yeah.

G. Alright, you had New England 100 times; you're minus 550. The Jets 30 times, minus 165.[1]

B. Uh, what are the times?

G. 30 times, Jets.

B. Yeah? Oh yeah, that was Johnny Phelps, yeah, o.k.

Gotshall's remark about "Johnny Phelps" suggests that he had forgotten that the defendant had placed a bet on the Jets on the previous day. More significantly, it suggests defendant's identification as the oft-mentioned "J.P." This hearsay also corroborated the earlier testimony identifying "J.P.'s" voice on the composite tape as that of defendant. Other discussions between Gerrizzo and DeMarco further confirmed that "J.P." and "Bill from Bach's" had a relationship as joint bettors.

The Gerrizzo-DeMarco tapes also were evidential in proving that defendant had introduced another bettor with the code name "Big Pete" into the operation. One pertinent conversation went as follows:

G. J.P. gave me some guy he said was going to call me. His name is Pete.

D. Pete?

G. Big Pete.

D. Big Pete.

G. Yeah. I don't know if he is going to call for J.P. I don't know if he is going to call himself. I don't know. Uh, he says, "There's a guy, Big Pete. He is going to call you." He says, "It's all right." I say, "Sure. I mean, is it all right with you? I mean, if there is—you know—you know—I don't want to get in any [expletive] trouble, so I will be." I say, "You know, is it okay?"

D. Uh, all right. No problem. Good.

The defendant objected to the admission of the conversations between "Bill from Bach's" (Gotshall) and Gerrizzo and between Gerrizzo and DeMarco. The trial court ruled that the conversations were admissible as declarations by a coconspirator under *Evid.R.* 63(9), despite the defendant's contentions

---

[1] The amount of the bettor's wages was expressed as a number followed by the word "times." In the gambler's vernacular, one "time" represents $5.00. One hundred "times" would therefore represent $500.00.

that (1) there was insufficient proof of a conspiracy and of defendant's participation in the conspiracy, and that such proof was a condition precedent to the admissibility of the hearsay, and (2) the court should have instructed the jurors to disregard the hearsay conversations if they found that such independent proof of a conspiracy was lacking.

## II

■ A statement, made other than by a witness while testifying, offered to prove the truth of the content of the statement is hearsay evidence and is inadmissible unless it falls within one of the hearsay exceptions, most of which are found in Rule 63(1) through Rule 63(32). *Evid.R.* 63. The exceptions are justified primarily because the circumstances under which the statements were made provide strong indicia of reliability. *See State v. Humphrey*, 183 *N.J.Super.* 580, 589 (Law Div.1982); Brooks, "Evidence," 14 *Rutgers L.Rev.* 390, 410–11 (1960) (contending that coconspirator's hearsay statements not be admissible unless there is some intrinsic guarantee of reliability); *cf.* Levie, "Hearsay and Conspiracy, A Reexamination of the Co-Conspirators' Exception to the Hearsay Rule," 52 *Mich.L.Rev.* 1159, 1163–66 (1954) (advocating admissibility because of "the very great probative need for it").

■ The coconspirator exception to the hearsay rule may be stated simply as follows: where two or more persons are alleged to have conspired to commit a crime or a civil wrong, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence against any other member of the conspiracy. *Evid.R.* 63(9)(b). The admissibility of a statement of a coconspirator has been firmly entrenched in our jurisprudence. As early as 1791 the Supreme Court held in *Patton v. Freeman*, 1 *N.J.L.* 134, 136, that a conversation among conspirators in the defendant's absence was admissible when there was proof of a conspiracy between the defendant and the declarants to perpetuate a fraud. Nu-

merous opinions since then have reconfirmed this exception to the hearsay rule. *E.g.*, *State v. Fischman*, 108 *N.J.L.* 550, 551 (E. & A.1931); *State v. Seidman*, 107 *N.J.L.* 204, 206–07 (Sup.Ct.1931); *State v. Dougherty*, 86 *N.J.L.* 525, 540–41 (Sup. Ct.1915).

Presenting to a jury relevant and material evidence furthers its fact-finding ability to discern where the truth lies. Thus, admissibility into evidence of a coconspirator's statement may advance that goal. This is particularly so in crimes involving conspiracy and fraud where much of the offense is effectuated through unwritten statements passed from one to another. It has been said, "silence, furtiveness and secrecy shroud the conduct and speech of coconspirators." Note, "The Coconspirator's Exception to the Hearsay Rule: Bootstrapping in the New Procedure from the First Circuit," 50 *U.Colo.L.Rev.* 93, 103–04 (1978). Coconspirator's hearsay may be essential to establishing the existence of an illicit agreement or association between them. Levie, *supra*, at 1163–66. This is especially significant in cases of organized crime.

When the Rules of Evidence were codified by this Court and the Legislature in 1967, *N.J.S.A.* 2A:84A–1 to –49, Evid.R. 63(9)(b) was formally adopted.[2] The rule in pertinent part reads:

> A statement which would be admissible if made by the declarant at the hearing is admissible against a party if * * * (b) at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan.

■ Three distinct conditions must be met for statements to qualify for admissibility under the Rule. First, the statement

---

[2]The Model Code of Evidence (1942) would have permitted admission of statements that were merely "relevant to" the conspiracy. Our Supreme Court Committee on Evidence rejected this position and recommended that the statement must have been made during the existence of and in furtherance of the illegal plan. *See Report of New Jersey Supreme Court Committee on Evidence* 167 (1963); *Report of the Commission to Study the Improvement of the Law of Evidence* 58 (1956).

must have been made in furtherance of the conspiracy. *State v. Rios*, 17 *N.J.* 572, 596 (1955). Second, the statement must have been made during the course of the conspiracy. *State v. Carbone*, 10 *N.J.* 329, 340 (1952); *State v. Yedwab*, 43 *N.J.Super.* 367, 374 (App.Div.), certif. denied, 23 *N.J.* 550 (1957). Lastly, our courts have held that there must be evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it. *State v. Boiardo*, 111 *N.J. Super.* 219, 230–31 (App.Div.), certif. denied, 57 *N.J.* 130 (1970), *cert.* denied, 401 *U.S.* 948, 91 *S.Ct.* 931, 28 *L.Ed.*2d 231 (1971); *State v. Hacker*, 167 *N.J.Super.* 166, 174 (Law Div.1979).

The first two conditions reflect notions that an agent's statements are vicariously attributable to a principal. *See State v. Carbone, supra*, 10 *N.J.* at 339–40 (ascribing the theory of admissibility to a joint or mutual agency and stating that the "acts and declarations of an agent, within the scope of his authority, are considered and treated as the acts and declarations of his principal"). The rationale is that participation in a conspiracy confers upon coconspirators the authority to act in another's behalf to achieve the goals of the common scheme. Since conspirators are substantively liable for the acts of their coconspirators in furtherance of the common plan, so too should they be responsible for statements uttered by coconspirators to further that plan. *See* Morgan, "The Rationale of Vicarious Admissions," 42 *Harv.L.Rev.* 461 (1929). Judge Learned Hand explained:

> Such declarations are admitted upon no doctrine of the law of evidence, but of the substantive law of crime. When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made "a partnership in crime." What one does pursuant to their common purpose, all do, and, as declarations may be such acts, they are competent against all. [*Van Riper v. United States*, 13 *F.*2d 961, 967 (2d Cir.1926).]

The last requirement, that the existence of a conspiracy and defendant's participation be demonstrated by evidence other than the hearsay statement sought to be admitted against the coconspirator, reduces the fear that a defendant might be convicted or held liable in damages solely on the basis of

evidence that he has had no opportunity to impeach or refute. *See Flintkote Co. v. Lysfjord,* 246 *F.*2d 368, 386–87 (9th Cir.), *cert.* denied, 355 *U.S.* 835, 78 *S.Ct.* 54, 2 *L.Ed.*2d 46 (1957). In *Glasser v. United States,* 315 *U.S.* 60, 75, 62 *S.Ct.* 457, 467, 86 *L.Ed.* 680, 701 (1942), the Supreme Court observed that in the absence of such independent evidence "hearsay would lift itself by its own boot straps to the level of competent evidence."

 The independent evidence may take many forms. There may be documentary material, such as books and records, testimony of witnesses, or other relevant evidence. There may be a combination of different types of proof. The evidence may be direct or circumstantial. In any event the independent evidence must be substantial enough to engender a strong belief in the existence of the conspiracy and of defendant's participation.

 This general requirement does not preclude the trial court, in determining whether the coconspirator hearsay exception should apply, from considering some hearsay evidence in conjunction with independent evidence. If the independent evidence is substantial, the trial court may also consider a coconspirator's hearsay statements that it decides are reliable and trustworthy to determine whether the State has met its burden of proving the existence of the conspiracy and the defendant's participation in it.

An important circumstance is that the nature of the hearsay should engender a strong sense of its inherent trustworthiness. Here, where telephone conversations have been taped during interceptions authorized by law and the integrity of the tapes assured, the dependability of the taped conversation would justify reliance on their content. So, too, when the declarant makes statements supportive of the existence of a conspiracy of which he is a part, its trustworthiness is enhanced because of the likelihood that he would not have made declarations contrary to his best interests unless they were truthful. 4 *J. Wigmore, Evidence* §§ 1077, 1079 (Chadbourn rev. ed. 1972);

*see Evid.R.* 63(10). For example, suppose government agents who are monitoring a narcotics operation pursuant to a court order overhear a conversation in which a dealer, A, speaks to a buyer, B. A tells B that he can expect a carrier, C, to arrive at B's home in a blue 1980 Chevrolet at midnight, that C is a 35-year-old white male about six feet tall, that C will be wearing a leather jacket and black pants, and that C will use the code name "Meatball." Suppose further that B turns State's witness and testifies at C's trial that this *entire* description turned out to be correct. There is no compelling reason why the circumstantial indicia of reliability provided by A's hearsay statement ought not be considered in determining whether A's hearsay statement is admissible against C under the coconspirator exception. When the coconspirator's hearsay statement is used because of its inherent reliability, it ought to be considered in tandem with the independent corroborative proof. *See United States v. Vinson,* 606 *F.*2d 149, 153 (6th Cir.1979), *cert.* denied, 444 *U.S.* 1074, 100 *S.Ct.* 1020, 62 *L.Ed.*2d 756 (1980); *United States v. Martorano,* 557 *F.*2d 1, 11–12 (1st Cir.1977), *cert.* denied, 435 *U.S.* 922, 98 *S.Ct.* 1484, 55 *L.Ed.*2d 515 (1978); *see also United States v. Petrozziello,* 548 *F.*2d 20, 23 n.2 (1st Cir.1977) (dictum); 1 *J. Weinstein & M. Berger, Weinstein's Evidence* ¶ 104[05], at 104–44 to –46 (1982); Bergman, "The Coconspirators' Exception: Defining the Standard of the Independent Evidence Test Under the New Federal Rules of Evidence," 5 *Hofstra L.Rev.* 99, 105 (1976). *But see United States v. James,* 590 *F.*2d 575, 581 (5th Cir.), *cert.* denied, 442 *U.S.* 917, 99 *S.Ct.* 2836, 61 *L.Ed.*2d 283 (1979); *United States v. Cambindo Valencia,* 609 *F.*2d 603, 631 (2d Cir.1979), *cert.* denied, 446 *U.S.* 940, 100 *S.Ct.* 2163, 64 *L.Ed.*2d 795 (1980); *United States v. Bell,* 573 *F.*2d 1040, 1044 (8th Cir.1978). In short, "the whole factual mosaic," *State v. Yedwab, supra,* 43 *N.J.Super.* at 378, should be examined.

Though this position is seemingly in harmony with *Evid.R.* 8(1), which provides that the Rules of Evidence need not be adhered to by the trial court when determining the admissibility of evidence, the defendant contends that admissibility is to be

resolved by the jury, not the trial court. We turn next to consideration of that contention.

## III

Defendant argues that the ultimate determination of whether the conspiracy and defendant's status has been established by independent evidence is for the jury. He maintains that the jury should have been instructed to consider the hearsay only if it found that the conspiracy had been proven. *See State v. D'Arco*, 153 *N.J.Super.* 258, 265 (App.Div.1977) (jury charged); *State v. Farinella*, 150 *N.J.Super.* 61, 68 (App. Div.) (jury charged), certif. denied, 75 *N.J.* 17 (1977). The defendant's contention conflicts both with the Rules of Evidence and with the purposes to be served by admission of the proposed evidence.

*Evid.R.* 8 provides clear guidance concerning who should determine the admissibility of coconspirator declarations. The Rule reads:

> (1) When the qualification of a person to be a witness, *or the admissibility of evidence,* or the existence of a privilege is stated in these rules to be subject to a condition, and the fulfillment of the condition is in issue, *that issue is to be determined by the judge.* In his determination the rules of evidence shall not apply except for Rule 4 or a valid claim of privilege. * * * The judge may hear and determine such matters out of the presence or hearing of the jury. This rule shall not be construed to limit the right of a party to introduce before the jury evidence relevant to weight or credibility.
>
> (2) Where evidence is otherwise admissible if relevant and *its relevance is subject to a condition,* the judge shall admit it if there is sufficient evidence to support a finding of the condition. In such cases the judge shall instruct the jury to consider the issue of the fulfillment of the condition and to disregard the evidence if they find that the condition was not fulfilled. The judge shall instruct the jury to disregard the evidence if he subsequently determines that a jury could not reasonably find that the condition was fulfilled. [*Evid.R.* 8(1) and (2) (emphasis added).]

Under *Evid.R.* 8(1), the trial court alone determines whether the conditions precedent to admission of coconspirator hearsay have been satisfied. These conditions (a statement made during and in furtherance of the conspiracy and the existence of other evidence of the conspiracy to which the defendant was a

party) focus on the *reliability* of the hearsay and not its *relevance*.

*Evid.R.* 8(2), on the other hand, concerns evidence whose relevance is subject to satisfaction of a condition precedent. The Rule delegates to the jury the function of deciding whether such a condition has been met. It should be noted that the original version of *Evid.R.* 8(2) referred to "competency," not "relevance," and the modification to "relevance" parallels *Fed. R.Evid.* 104. *See Evid.R.* 8 comment 5 (1983). The *Report of the New Jersey Supreme Court Committee on Evidence* (1963), in its comment on a prior draft of Rule 8, expressed the thought that

conditions of admissibility * * * must be found by the judge. Rule 8 provides that the judge shall find the necessary preliminary facts and that, with certain indicated exceptions, his finding on the question of admissibility shall be final. These are cases in which the evidence, if found inadmissible, is excluded not because it is not relevant but rather in spite of its relevance, for reasons of established policy which in most cases are not readily understood by a jury. It is necessary in such cases to keep the preliminary facts bearing on admissibility from the jury. A binding preliminary finding is therefore made by the judge. This much is universal doctrine and is entirely consonant with New Jersey law. *See, e.g., Clendennin v. Clancy*, 82 *N.J.L.* 418, 81 *Atl.* 750 (E. & A.1911); *Moosbrugger v. Swick*, 86 *N.J.L.* 419, 92 *Atl.* 269 (Sup.Ct.1914). [*Id.* at 23.]

*Fed.R.Evid.* 104(a) and (b) are comparable to *Evid.R.* 8. The Federal Rule reads in pertinent part as follows:

(a) *Questions of admissibility generally.* Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

(b) *Relevancy conditioned on fact.* When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition. [*Fed.R.Evid.* 104(a) and (b), 28 *U.S.C.A.* (1975).]

Further, the language of *Fed.R.Evid.* 801(d)(2) is similar to our *Evid.R.* 63(9)(b). The Federal Rule provides that a "statement is not hearsay if * * * (2) * * * The statement is offered against a party and is * * * (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The federal circuit courts have overwhelmingly inter-

preted *Fed.R.Evid.* 104(a) and (b) and 801(d)(2)(E) to require the trial court to decide the issue of admissibility of a coconspirator's hearsay statement. *See United States v. Alvarez,* 696 *F.* 2d 1307, 1310 (11th Cir.1983), *cert.* denied, — *U.S.* —, 103 *S.Ct.* 1878, 76 *L.Ed.*2d 809 (1983); *United States v. Ciampaglia,* 628 *F.*2d 632, 637–38 (1st Cir.), *cert.* denied, 449 *U.S.* 956, 101 *S.Ct.* 365, 66 *L.Ed.*2d 221 (1980); *United States v. Jackson,* 627 *F.*2d 1198, 1216–18 (D.C.Cir.1980); *United States v. Petersen,* 611 *F.*2d 1313, 1330 (10th Cir.1979), *cert.* denied, 447 *U.S.* 905, 100 *S.Ct.* 2985, 64 *L.Ed.*2d 854 (1980); *United States v. Santiago,* 582 *F.*2d 1128, 1130–33 (7th Cir.1978); *United States v. Enright,* 579 *F.*2d 980, 985–87 (6th Cir.1978); *United States v. Bell,* 573 *F.*2d 1040, 1043 (8th Cir.1978); *United States v. Stanchich,* 550 *F.*2d 1294, 1297–98 (2d Cir.1977). *Accord* 4 *J. Wigmore, supra,* § 1079, at 26 (Supp.1983) ("The question of whether or not there is sufficient independent evidence of a conspiracy should be decided by the judge. The jury has no part in that decision.").

Having the trial court rather than the jury evaluate reliability before admitting or rejecting evidence recognizes the judge's skill and experience. Jurors lack that training and could be unduly influenced by unreliable hearsay.[3] Instructing the jurors would necessarily apprise them of the court's preliminary finding of a conspiracy and perhaps influence their considera-

---

[3]The dissent argues that this State has allowed "nothing to come between the jury and the discharge of [its fact finding] function." *Post* at 534. This is untrue. The courts have always had the obligation of preventing a jury, at least on objection, from hearing inadmissible evidence. The dissent overlooks the fundamental notion that the jury is entitled to hear and to make its judgment on the basis of admissible evidence. Such an entitlement does not and should not apply to inadmissible evidence, evidence that has been deemed to be unreliable. The trial court's decision concerning whether evidence is admissible does not decide the guilt or innocence of the defendant. That is the jury's task. Further, if the trial court's decision is that the evidence is inadmissible, then the jury should not be influenced in any way by that evidence. Nor should it decide guilt or innocence based on that inadmissible evidence.

tion of the substantive conspiracy count. *See United States v. Santiago, supra,* 582 *F.*2d at 1132. It is too much to expect jurors to be able to disregard evidence they have already properly heard upon their determination at some later time that conditions precedent to admissibility have not been fulfilled. As Judge Learned Hand observed, "it is a practical impossibility for laymen, and for that matter for most judges, to keep their minds in the isolated compartments that this requires." *United States v. Dennis,* 183 *F.*2d 201, 231 (2d Cir.1950), aff'd, 341 *U.S.* 494, 71 *S.Ct.* 857, 95 *L.Ed.* 1137 (1951).

█ The defendant argues that if the jury finds a defendant not guilty of the conspiracy, the coconspirator's hearsay statements must be disregarded. This contention is flawed for two reasons. First, the evidence may be relevant on substantive issues other than conspiracy, such as the defendant's official misconduct in this case. *See State v. Louf,* 64 *N.J.* 172, 176 (1973); *State v. Yormark,* 117 *N.J.Super.* 315, 336 (App.Div. 1971), certif. denied, 60 *N.J.* 138, *cert.* denied, 407 *U.S.* 925, 92 *S.Ct.* 2459, 32 *L.Ed.*2d 812 (1972). Once the statement is admitted, it may properly be considered by the jury on all matters with respect to which the statement is relevant. Indeed, the statement of a coconspirator may be admissible even though the defendant has not been indicted, let alone convicted, of conspiracy. *State v. Carbone, supra,* 10 *N.J.* at 338. Second, the difference between the standards of proof assigned to criminal guilt (beyond a reasonable doubt) as compared with evidential admissibility ("preponderance," "substantial," or "reliable" evidence) would justify consideration of coconspirator hearsay against a party acquitted of a proven conspiracy because he successfully raised a statutory defense such as renunciation. *See N.J.S.A.* 2C:5–2e.

IV

A corollary issue concerns the standard of proof that the court should apply to decide whether the conditions precedent

to admissibility have been met. Our courts have applied several different standards. Some have required that the prosecution produce only a "prima facie" showing that a conspiracy existed and that the hearsay was uttered during and in furtherance of the conspiracy. *See State v. Cavanna,* 70 *N.J.Super.* 176, 180–81 (App.Div.1961), certif. denied, 36 *N.J.* 298 (1962). Others have approved the fair preponderance of the evidence or a likelihood of illicit association test. *See State v. D'Arco, supra,* 153 *N.J.Super.* at 263; *State v. Sherwin,* 127 *N.J.Super.* 370, 383 (App.Div.), certif. denied, 65 *N.J.* 569, *cert.* dismissed, 419 *U.S.* 801, 95 *S.Ct.* 9, 42 *L.Ed.*2d 32 (1974); *State v. Seaman,* 114 *N.J.Super.* 19, 28 (App.Div.), certif. denied, 58 *N.J.* 594 (1971), *cert.* denied, 404 *U.S.* 1015, 92 *S.Ct.* 674, 30 *L.Ed.*2d 662 (1972). In *State v. Boiardo, supra,* 111 *N.J.Super.* at 231, the court applied yet another standard—"sufficient" proof. Finally, in *State v. Hacker, supra,* 167 *N.J.Super.* at 174, the court adopted a rule of "slight evidence" to allow the jury to decide if the defendants were coconspirators after it had determined the existence of the conspiracy beyond a reasonable doubt.

The standard most favored by the federal circuit courts is that of a fair preponderance of the evidence. *See, e.g., United States v. Cicale,* 691 *F.*2d 95, 103 (2d Cir.1982), *cert.* denied, —— *U.S.* ——, 103 *S.Ct.* 1771, 76 *L.Ed.*2d 344 (1983); *United States v. Kopituk,* 690 *F.*2d 1289, 1324 (11th Cir.1982), *cert.* denied, —— *U.S.* ——, 103 *S.Ct.* 2089, 77 *L.Ed.*2d 300 (1983); *United States v. Rodriquez,* 689 *F.*2d 516, 518 (5th Cir.1982); *United States v. Ciampaglia, supra,* 628 *F.*2d at 638; *United States v. Provenzano,* 620 *F.*2d 985, 999–1000 (3d Cir.), *cert.* denied, 449 *U.S.* 899, 101 *S.Ct.* 267, 66 *L.Ed.*2d 129 (1980); *United States v. Santiago, supra,* 582 *F.*2d at 1134–35; *United States v. Enright, supra,* 579 *F.*2d at 986. This standard is sometimes expressed in terms of "likelihood." *See, United States v. Jones,* 542 *F.*2d 186, 203 & n.32 (4th Cir.), *cert.* denied, 426 *U.S.* 922, 96 *S.Ct.* 2629, 49 *L.Ed.*2d 375 (1976). Under this approach, the prosecution must prove that it is more probable than not that

defendant participated in an existing conspiracy in order for the hearsay to be admitted. *See generally* Saltzburg, "Standards of Proof and Preliminary Questions of Fact," 27 *Stan.L.Rev.* 271 (1975).

The United States Circuit Court of Appeals for the Ninth Circuit and several state and federal district courts have adopted a lesser standard, requiring that the prosecution make only a "prima facie" showing that a conspiracy existed and that the hearsay was uttered during its existence and in its furtherance. *See, e.g., United States v. Miranda-Uriarte,* 649 *F.*2d 1345, 1349 (1981); *United States v. Weiner,* 578 *F.*2d 757, 768–69, *cert.* denied, 439 *U.S.* 981, 99 *S.Ct.* 568, 58 *L.Ed.*2d 651 (1978); Annot., "Necessity and Sufficiency of Independent Evidence of Conspiracy to Allow Admission of Extrajudicial Statements of Coconspirators," 46 *A.L.R.*3d 1148, § 5 (1972 & Supp.1983), and cases cited therein. Some courts have modified this approach. After a "prima facie" showing of the existence of the conspiracy, only "slight evidence" of defendant's participation need be produced. *See, e.g., United States v. Brooklier,* 685 *F.*2d 1208, 1219 (9th Cir.1982), *cert.* denied, 459 *U.S.* 1206, 103 *S.Ct.* 1194, 75 *L.Ed.*2d 439 (1983); *United States v. Tiche,* 424 *F.Supp.* 996, 1103–04 (W.D.Pa.), aff'd, 564 *F.*2d 90 (3d Cir. 1977); *see also* Annot., *supra,* 46 *A.L.R.*3d 1148, § 6 (1972 & Supp.1983), and cases cited therein.

A few commentators have suggested that the conditions precedent be established by proof "beyond a reasonable doubt" before admitting a coconspirator's declarations. *See J. Weinstein & M. Berger, supra,* ¶ 104[05], at 104–44; Bergman, *supra,* at 100, 106; Saltzburg, *supra,* at 273–74.

■■ We believe that the appropriate test should be whether the prosecution has demonstrated by a fair preponderance of evidence that the conspiracy existed and that the defendant participated in it. In making that determination, the trial court may consider the coconspirator's hearsay declaration if it is satisfied that such declaration is reliable and that there is other

evidence substantial enough to engender a belief in the conspiracy's existence and the defendant's participation in it. Furthermore, we note that in making its determination the trial court is not bound by the Rules of Evidence except for a valid claim of privilege. *Evid.R.* 8(1).

Requiring proof "beyond a reasonable doubt" would place too heavy a burden on the prosecution and would exclude trustworthy information. The ruling involves admissibility of evidence, not determination of guilt or innocence. On the other hand, the "prima facie" standard has the tendency to permit into evidence statements that may be only marginally reliable. It has also been said that this test would encourage courts to deemphasize competency of evidence and improperly shift to the jurors the burden of determining competency. *See* Saltzburg, *supra*, at 302–04. Indeed, this "slight evidence" standard contains the seed of sweeping in innocent parties on the periphery of a conspiracy. It would be possible to assimilate slight evidence connecting defendant by business or social association with known conspirators despite the fact that the defendant had no relationship with the illegal combination. *See* Comment, "The Hearsay Exception for Co-conspirators' Declarations," 25 *U.Chi.L.Rev.* 530, 539–41 (1958). Moreover, since the trial court, when it considers the matter under *Evid.R.* 8, need not adhere to the Rules of Evidence, questions will arise concerning whether and what evidence supports a prima facie showing.

On balance, the "fair preponderance" is the most appropriate guideline. It will adequately safeguard defendants and yet permit the jury to hear reliable and trustworthy information. Accordingly, we adopt that standard.

## V

 The timing of the trial court's determination of admissibility may, as a practical matter, vitally affect the fairness of trial. No problem arises when the prosecution satisfies the conditions precedent before the hearsay statement

is admitted. In those circumstances the trial court will usually have held a hearing and determined the "matters out of the presence or hearing of the jury." *Evid.R.* 8(1). Such a hearing is not necessary, however, to entertain frivolous objections to coconspirator declarations. A full-blown hearing should be conducted where the quantum of the hearsay to be admitted is substantial and the risk of prejudice is severe.

 Sometimes prosecutors offer the coconspirator's declarations into evidence before establishing the conditions precedent to admissibility in order to present their case in an orderly and understandable fashion to the jury. These offers are accompanied by a representation that the necessary proofs will be furnished subsequently. When a trial court accedes to this request but the prosecutor fails to satisfy the conditions, the trial court generally should grant a mistrial upon the defendant's motion, *see United States v. James, supra,* 590 *F.*2d at 581–83, unless the trial court is convinced that the error is harmless. In that event the trial court should give a cautionary instruction to the jury, unless the defendant objects to such an instruction. It should be noted that if a mistrial has been granted because of the prosecutor's misconduct, double jeopardy may prevent a retrial of the defendant. *See State v. Rechtschaffer,* 70 *N.J.* 395, 406 (1976) ("It is well settled that if prosecutorial misbehavior or manipulation causes the mistrial, the defendant should not be subjected to the harassment of a second trial.").

## VI

 In applying these principles to this case, we find that there was substantial evidence of a conspiracy and of defendant's participation in that conspiracy in addition to and independent of the coconspirator's declarations.

### A. *Statements by "Bill from Bach's"*

The most damaging coconspirator hearsay statements admitted against defendant were the wiretapped conversations be-

tween Gerrizzo and William Gotshall, also known as "Bill from Bach's." The trial court record clearly demonstrates by a preponderance of the evidence, both independent of and including the hearsay itself, that a common plan to conduct illegal gambling existed when the telephone conversations were intercepted; that defendant, John Phelps, was then a member of that conspiracy; and that the "Bill from Bach's" conversations were uttered in furtherance of that common plan.

There can be no doubt that a large-scale bookmaking enterprise was in progress contemporaneously with the Gerrizzo-Gotshall telephone conversations. The betting records confiscated in the residences of Gerrizzo and DeMarco complemented each other. Thus, portions of the individual betting records seized from Gerrizzo setting forth the names of the bettors, the amount bet, the football game, and the team selected corresponded with information listed on sheets of paper seized in DeMarco's apartment. In addition, the pattern of incoming telephone calls to Gerrizzo's apartment and the discussions between DeMarco and Gerrizzo clearly established that a gambling conspiracy was being operated at all times during the conversations. The defendant does not dispute this.

The record repeatedly discloses that Phelps and Gotshall (*i.e.,* "J.P." and "Bill from Bach's") had an agreement to place bets for one another under the same illegal account. Bill made no less than twenty-seven calls to Gerrizzo discussing his shared gambling account with "J.P." The identity of "J.P." was convincingly proven both by the call in which defendant was mentioned by his full name, by Inspector Romano's identification of the voice of "J.P." as defendant's, and by a comparison of the known sample of defendant's voice with the voice on the "J.P." composite. In several of the seven conversations on the "J.P." composite, "J.P." alluded to "Bill" and inquired about wagers "Bill" had made on their joint account. He joked about "Bill's" tendency to bet heavily when drunk. He ceased his own attempts to wager upon learning that "Bill" had already phoned in their joint bets. These admissions substantially

corroborated the existence of the conspiracy and the defendant's participation therein.

Taken as a whole, the "J.P." tapes and the "Bill from Bach's" tapes firmly corroborate that defendant and William Gotshall had a working relationship to maintain a shared gambling account with Gerrizzo and DeMarco.

Nor can there be any doubt that the intercepted "Bill from Bach's" statements were made in furtherance of the common plan between Phelps and Gotshall. Defendant argued at trial that it is not a crime *per se* for an ordinary citizen to place a bet with a bookmaker. Defendant was not, however, an ordinary citizen, but a police officer sworn to uphold the laws of this State. By placing bets jointly with Gotshall, defendant furthered a known illegal bookmaking operation. Defendant's own financial participation in that enterprise diminished their chances of detection by law enforcement authorities. By using Gotshall as an agent to place most of his own bets and to arrange the transfer of monies to and from the bookmakers, defendant minimized the chances of his own exposure. One might conceive of a conspiratorial chain of activities here: the Gotshall conversations were in furtherance of Phelps's agreement with Gotshall, which, in turn, furthered the overall gambling conspiracy among defendant and the bookmakers.

Defendant contends that his acquittal on the counts charging him with conspiracy to promote gambling, to maintain a gambling resort, or to commit official misconduct demonstrate his lack of involvement in any such "common plan." This contention misses the mark in that criminal acquittal of the conspiracy for which defendant was indicted does not logically or legally preclude a finding that the relevant evidence was admissible. The burden of proof with respect to admissibility of such evidence is a preponderance of the evidence as contrasted with the burden of proof with respect to a conviction, that is, beyond a reasonable doubt. Further, as previously observed, a cocon-

spirator's statement may be relevant on matters other than the issue of conspiracy.

### B. *Statements by Gerrizzo and DeMarco*

The analysis with respect to the "Bill from Bach's" tapes is equally applicable to the Gerrizzo-DeMarco tapes. Ample incriminating evidence was offered at trial to substantiate the existence of a bookmaking racket operated by Gerrizzo and DeMarco. Defendant's participation in that scheme as a regular bettor is also beyond dispute. Defendant's Patrolmen's Benevolent Association card was even seized from DeMarco's wallet at the time of DeMarco's arrest.

Perhaps the strongest evidence that defendant was a member of the DeMarco-Gerrizzo conspiracy to promote gambling was his introduction of a new bettor, "Big Pete," into the operation. The record further reveals that "Big Pete" subsequently did place wagers with Gerrizzo after receiving defendant's authorization.

The Gerrizzo-DeMarco conversations were also in furtherance of the common scheme. Gerrizzo reported to DeMarco, his boss, the status of the gambling "action" of the previous day, discussing wagers placed and amounts owed to and from various bettors, including defendant. DeMarco gave Gerrizzo future instructions, including his approval of credit for defendant's new wagerer, "Big Pete." Such dialogue was no doubt typical of the overall venture, perhaps even essential to its success.

### VII

The coconspirator's hearsay exception under *Evid.R.* 63(9) was properly applied, both to the declarations by William Gotshall and those by Thomas DeMarco and Angelo Gerrizzo. The evidence overwhelmingly indicates a common plan to promote gambling—a plan that defendant furthered as an active wagerer, as a solicitor of a new gambler, and as a law enforcement

officer assigned to ferret out and prevent crime in the area. The telephone conversations occurred during and in furtherance of the conspiracy. The existence of that common scheme and defendant's membership therein were properly decided by the trial court alone on the basis of a preponderance of independent evidence corroborated by the hearsay declarations themselves.

The judgment of conviction is affirmed.

HANDLER, J., dissenting.

In this case, the lower courts have determined that hearsay conversations were admissible against defendant as declarations by a coconspirator under Evidence Rule 63(9). In doing so these courts rejected defendant's contentions that there was insufficient independent proof—proof other than hearsay—of a conspiracy and of defendant's participation in the conspiracy, which proof was a condition to the admissibility of the hearsay, and further, that the jury, in its final determination of the ultimate guilt or innocence of the defendant, should have been instructed to disregard the hearsay conversations if it found that such independent proof of a conspiracy was lacking. The Court now upholds this ruling.

The majority recognizes, as do I, that there is a well-established exception to the hearsay rule governing statements of coconspirators, Evidence Rule 63(9), and that the majority of jurisdictions in applying this exception do not require a separate jury determination of the adequacy of the independent evidence of the conspiracy as a condition necessary for the admission of such hearsay. It is the Court's implementation of the coconspirator exception to the hearsay rule in the setting of this case that occasions my dissent.

I do not believe that the general rule governing the application of the coconspirator hearsay exception can be used in cases such as the one before us. Here, damaging coconspirator hearsay was brought to the attention of the jury before the condition for its admissibility had been satisfied, namely, the

introduction of independent proof of the existence of conspiracy. The potential for prejudice in this situation, perhaps inevitable and unavoidable, is so great that courts must strive to mitigate it. Such mitigation can, at least minimally, be accomplished (1) by giving the jury cautionary instructions on the conditional admission of coconspirator hearsay during the trial in advance of any independent evidence of the conspiracy, and (2) by permitting the jury to consider the adequacy of the independent proof of the conspiracy as a precondition to its consideration of the coconspirator hearsay in its final deliberations upon the ultimate guilt of the defendant.

I

The enormous potential for unfair prejudice to a defendant from the presentation of coconspirator hearsay is exemplified in this case. The major evidence relied on by the State in the trial were taped or recorded telephone conversations derived from wiretaps obtained pursuant to *N.J.S.A.* 2A:156A–10. However, not all of the recorded conversations were offered in evidence. Particular conversations on the tapes—those most incriminating—were extracted and spliced into a "composite." In conjunction with these composites, which represented a concentration of the inculpatory conversations, the State used "log sheets," written summaries of the selected taped conversations.

The theory of the prosecution was that defendant, Phelps, and William Gotshall, a bartender at Bach's Tavern in Lake Hiawatha, had agreed to place bets jointly for one another. Early in the presentation of the State's case, a witness alluded to certain taped conversations ostensibly between defendant and another individual referred to as "Bill from Bach's," who was identified as Gotshall. There were 27 taped conversations in which "Bill from Bach's" refers to one "J.P." or "Johnny" in the course of discussing gambling transactions with one Gerrizzo.

Defendant timely objected to the admission of any taped conversations of "Bill from Bach's," or any references thereto, as hearsay, on the ground that defendant had not been identified as a party to that conversation and it had not been shown by any independent evidence that he was a member of the conspiracy with the parties to the conversations. The State disagreed, asserting that the conversations were admissible as declarations by a coconspirator under Evidence Rule 63(9). After an extensive discussion outside of the jury's presence, the trial judge allowed the "Bill from Bach's" composite tape into evidence. Similarly, taped hearsay conversations between Gerrizzo and one DeMarco, referring to "J.P." and "Bill," were also admitted under Evidence Rule 63(9).

These evidentiary rulings were important to the State's case. Even though there was some testimony by a witness that he could identify "J.P.'s" voice on the tapes as that of John Phelps, based on police work he and Phelps had performed together in the past, the "Bill from Bach's" testimony was obviously crucial in establishing defendant's identification. Significantly, the only time that defendant's full name was mentioned throughout the entire wiretap surveillance was in a single conversation between Gerrizzo and "Bill from Bach's." That conversation pertained to a dispute between "Bill from Bach's" and Gerrizzo over the balance in the gambling account shared by "J.P." and "Bill from Bach's." Gerrizzo quoted a figure, and Gotshall insisted that it should be higher. At that point, Gerrizzo suggested that he, "Bill from Bach's," review the preceding day's action, item-by-item. In response to a particular bet, Gotshall stated "that was Johnny Phelps," clearly implying that "Johnny Phelps" was the oft-mentioned "J.P." Another hearsay discussion between Gerrizzo and DeMarco was also read to the jury that further confirmed the relationship between "J.P." and "Bill from Bach's" as joint bettors.

This factual picture discloses the overwhelming hearsay that dominated the prosecution of this case. It underscores the critical significance that must be invested in the independent

proof of conspiracy, which becomes the evidential gate through which the hearsay passes.

## II

Traditionally, courts have required that the prosecution establish defendant's connection with an existing conspiracy by "proof *aliunde*," or independent evidence, before admitting hearsay declarations by coconspirators. "Otherwise hearsay would lift itself by its own bootstraps to the level of competent evidence." *Glasser v. United States*, 315 *U.S.* 60, 74, 62 *S.Ct.* 457, 467, 86 *L.Ed.* 680, 701 (1942); *see also United States v. Nixon*, 418 *U.S.* 683, 701 n. 14, 94 *S.Ct.* 3090, 3104 n. 14, 41 *L.Ed.*2d 1039, 1060 n. 14 (1974) (admission of coconspirator hearsay requires "substantial, independent evidence of the conspiracy, at least enough to take the question to the jury" (dictum)).

A majority of federal and state authorities have adopted the *Glasser* "bootstrap" argument and have accordingly required that the conditions of admissibility be established by proof independent of the hearsay declarations themselves. *See, e.g., United States v. Provenzano*, 620 *F.*2d 985, 999 (3d Cir.), *cert.* denied, 449 *U.S.* 899, 101 *S.Ct.* 267, 66 *L.Ed.*2d 129 (1980); *United States v. James*, 590 *F.*2d 575, 580–81 (5th Cir.), *cert.* denied, 442 *U.S.* 917, 99 *S.Ct.* 2836, 61 *L.Ed.*2d 283 (1979); *United States v. Jones*, 542 *F.*2d 186, 203 (4th Cir.), *cert.* denied, 426 *U.S.* 922, 96 *S.Ct.* 2629, 49 *L.Ed.*2d 375 (1976); *United States v. Alvarez*, 696 *F.*2d 1307, 1309, 1310 (11th Cir.1983); *United States v. Jackson*, 627 *F.*2d 1198, 1214–15 (D.C.Cir.1980); *United States v. Petersen*, 611 *F.*2d 1313, 1330 (10th Cir.1979); *United States v. Rosales*, 584 *F.*2d 870, 872 (9th Cir.1978); *United States v. Ziegler*, 583 *F.*2d 77, 79–80 (2d Cir.1978); *United States v. Santiago*, 582 *F.*2d 1128, 1133 n. 11 (7th Cir.1978); *United States v. Bell*, 573 *F.*2d 1040, 1044 (8th Cir.1978). *But see United States v. Vinson*, 606 *F.*2d 149, 153 (6th Cir.1979), *cert.* denied, 444 *U.S.* 1074, 100 *S.Ct.* 1020, 62

*L.Ed.*2d 756 (1980); *United States v. Martorano*, 557 *F.*2d 1, 11–12 (1st Cir.1977), *cert.* denied, 435 *U.S.* 922, 98 *S.Ct.* 1484, 55 *L.Ed.*2d 515 (1978); *United States v. Petrozziello*, 548 *F.*2d 20, 23 n. 2 (1st Cir.1977) (declarant's statement is considered supplementary to whatever independent evidence prosecution offers to satisfy preconditions of admissibility). New Jersey courts have long adhered to the independent proof requirement. *E.g., State v. Dougherty*, 88 *N.J.L.* 209, 213 (E. & A. 1915); *State v. D'Arco*, 153 *N.J.Super.* 258, 263–64 (App.Div.1977); *State v. Benevento*, 138 *N.J.Super.* 211, 217 (App.Div.1975); *State v. Sherwin*, 127 *N.J.Super.* 370, 383 (App.Div.1974).

The critical question then is not whether there must be independent proof of a conspiracy involving the defendant but whether the jury, as well as the judge, must determine the adequacy of such proof in order to consider coconspirator hearsay tending to establish such a conspiracy. The implicating statements of a coconspirator can have a dramatic impact on a jury. Consequently, determination of the predicates to admissibility can be critical to a trial's outcome. If the judge alone resolves the preliminary questions of admissibility, "there is the possibility that the defendant has been deprived of trial by jury on a critical question of fact." Note, "The Impact of Federal Rule of Evidence 104 on the Coconspirator Exception to the Hearsay Rule," 28 *Emory L.J.* 1115, 1116 (1979) (hereinafter referred to as "The Coconspirator Exception"). The drafters of Federal Rule of Evidence 104, which is "comparable to our own *Evid.R.*8," *ante* at 514, cautioned that "[i]f preliminary questions of conditional relevancy were determined solely by the judge * * * the functioning of the jury as a trier of fact would be greatly restricted and, in some cases virtually destroyed." *Fed.R.Evid.* 104, Notes of Advisory Committee on Proposed Rules at 41 (1975). In fact, the Appellate Division here acknowledged that a "reasonable argument" may be advanced for an interpretation that could permit the jury to consider whether there is independent proof of the conspiracy. 187 *N.J.Super.* at 369.

Nevertheless, according to the majority, Evidence Rule 8 provides "clear guidance" concerning who should determine the admissibility of coconspirator declarations. *Ante* at 513. The majority asserts that the conditions precedent to admission of coconspirator hearsay "focus on the *reliability* of the hearsay, and not its *relevance.*" *Ante* at 514 (emphasis in original). However, contrary to the Court's implicit suggestion, Federal Rule of Evidence 104, and our own counterpart, Evidence Rule 8, simply by codifying the common law allocation of the roles of judge and jury in deciding preliminary questions of fact (by distinguishing between matters of competency, to be determined by the judge, and relevancy, to be decided by the jury [1]), did not dispositively resolve the question of the proper procedure for determining the admissibility of coconspirator statements. "Although clarification of the proper procedure for determining the admissibility of coconspirators' statements was needed, the federal rules did not recognize the problems inherent in this area." Note, "The Coconspirator Exception," *supra,* 28 *Emory L.J.* at 1119. In fact, it has been noted by several courts and legal commentators that with regard to such statements, the rule is ambiguous, for the preliminary issues involved in this context "could be equally well characterized as matters of competency or of conditional relevancy." *Id.; see also United States v. James, supra,* 590 *F.*2d at 579 (neither language of Federal Rule of Evidence 104 nor Advisory Committee's notes indicate whether coconspirator statements fall under rule 104(a) as competency questions or rule 104(b) as relevancy questions); *United States v. Enright,* 579 *F.*2d 980, 984 (6th Cir.1978) (unclear whether rule 104(a) or 104(b) governs admissibility); Note, "Inconsistencies in the Federal Circuit Courts' Application of the Coconspirator Exception," 39

---

[1] Issues raising questions of competency or reliability are conclusively resolved by the judge. 1 *J. Weinstein & M. Berger, Weinstein's Evidence* § 104 (1979). Preliminary issues that raise questions of the probative force of evidence—relevancy—must be left to the jury. *Id.*

*Wash. & Lee L.Rev.* 125, 132 (1982) ("[r]ules 104(a) and (b) * * have not resolved conclusively whether the judge or the jury should determine the ultimate admissibility of coconspirator statements").

It is not unreasonable to suggest that a determination of whether to admit the hearsay declarations of coconspirators involves a question of relevancy conditioned on fact, and thus, under Evidence Rule 8(2), is appropriately within the province of the jury. Past practice in our jurisdiction and sound policy reasons reasonably require that the trial judge alone should not determine whether the condition precedent to admissibility has been satisfied. *See, e.g., State v. D'Arco, supra,* 153 *N.J.Super.* 258; *State v. Farinella,* 150 *N.J.Super.* 61 (App.Div.), certif. den., 75 *N.J.* 17 (1977).

As noted, neither the rules of evidence nor their annotations lend guidance with respect to whether the existence of the conspiracy is properly before the judge as a question of competency or the jury as a question of relevancy. While the weight of authority characterizes the problem as one of competence, thereby vesting the judge with exclusive authority, it is reasonably clear that the central purpose of this characterization is to prevent the introduction of evidence that may unfairly prejudice a defendant.

Ironically, the rule espoused by the majority—permitting the jury to consider the coconspirator hearsay without qualification—serves only to aggravate the potential for prejudice to the defendant. Labeling the independent proof of the conspiracy a matter of "reliability," relating only to admissibility of the hearsay, relegates the task of considering such independent proof exclusively to the court.

Those courts that have eschewed the separate dual judge-jury determination of admissibility have pointed to the tremendous impact on the jury of a statement by a coconspirator. They have recognized that there is the danger that the jury will not make the preliminary determination of the existence of a con-

spiracy at all, but will be so influenced by the hearsay that it cannot help but consider that evidence in connection with defendant's guilt. *United States v. James, supra,* 590 *F.*2d 575; *United States v. Santiago, supra,* 582 *F.*2d 1128; *see Carbo v. United States,* 314 *F.*2d 718, 736 (9th Cir.1963) (the hearsay should "be considered by the jury *in reaching* its determination upon the issue of innocence or guilt. It will not do to tell the jury that it must reach its determination first" (emphasis in original)); *United States v. Dennis,* 183 *F.*2d 201 (2d Cir.), aff'd, 341 *U.S.* 494, 71 *S.Ct.* 857, 95 *L.Ed.* 1137 (1951). Arguably, if the jury concludes that the independent evidence is insufficient, but because of the coconspirator's statements believes the defendant guilty, it may feel obliged somewhow to find the preliminary facts proved, lest it exculpate a guilty person. Note, "The Coconspirator Exception," *supra,* 28 *Emory L.J.* at 1126. *See* Gibson, "Co-Conspirator Declarations: Constitutional Defects in the Admissions Procedure," 9 *U.C.D. L.Rev.* 63 (1976); *cf. Jackson v. Denno,* 378 *U.S.* 368, 84 *S.Ct.* 1774, 12 *L.Ed.*2d 908 (1964) (jury will feel pressured to find trustworthy confession to be voluntary).[2]

The majority accepts these arguments when it notes that "[i]t is too much to expect jurors to be able to disregard evidence they have already properly heard upon their determination at some later time that conditions precedent to admissibility have not been fulfilled." *Ante* at 516. The Court refers to the observation that "it is a practical imposibility for laymen, and for that matter most judges, to keep their minds in the isolated

---

[2]Analogizing to the approach employed by courts to determine the admissibility of confessions, under the "New York rule" the judge was required to make a *prima facie* determination of the voluntariness of the confession, but the question was ultimately submitted to the jury. (*Cf.* the "Massachusetts rule," where the judge made the initial determination but resubmitted the issue to the jury for their "second opinion.") This approach was invalidated by the Supreme Court as "pos[ing] substantial threats to a defendant's constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and reliably determined." *Jackson v. Denno, supra,* 378 *U.S.* at 389, 84 *S.Ct.* at 1787, 12 *L.Ed.*2d at 922.

compartments that this requires." *Id.* (quoting *United States v. Dennis, supra,* 183 *F.*2d at 231).

I am disturbed by the Court's acceptance of this supposed decisional impossibility as a reason for resolving the handling of the issue contrary to the interests of the defendant. Advocates of a jury determination of the preliminary fact have countered that the "denial of reality" effected by such a procedure "seems worthwhile when the alternative apparently leads to far greater conflicts with reality." Kessler, "The Treatment of Preliminary Issues of Fact in Conspiracy Litigations: Putting the Conspiracy Back Into the Coconspirator Rule," 5 *Hofstra L.Rev.* 77, 85 (1976) (hereinafter referred to as "The Coconspirator Rule"). Concern for the quality of jury deliberations and recognition of the particularly suspect and exceptionally powerful nature of this species of hearsay suggest that *less* prejudice would inure to the defendant by allowing the jury to consider admissibility. Jury consideration of the independent evidence as a condition of admissibility would be conducive to a more critical and conscientious assessment of the evidence ultimately pointing to guilt or innocence. If *less* prejudice would result by giving the issue of the adequacy of the independent evidence to the jury, it seems that the question under our operative rule, Evidence Rule 8, could just as freely be characterized as one of conditional relevance.[3]

---

[3]It has been strenuously argued that the preliminary facts at issue in the coconspirator exception do not implicate concerns of competency.

> [T]he independent-proof-of-preliminary-facts requirement of the coconspirator rule is not a competency requirement. The requirements are actually guides for the trier of fact. No matter what the verbiage of the declaration, the independent evidence requirement instructs the trier of fact how to treat the proof. If the statement does not prove the conspiracy, he is to eliminate it from his consideration until he finds that proof in the record. If the statement does prove the conspiracy, the trier of fact is instructed to perform the same intellectual analysis * * * to corroborate the credibility of the declarant. It is the fact assessment attribute of this unique requirement that makes any judicial decision of the preliminary issue inappropriate. The policy behind the rule is to balance the need for the testimony

There is some historical support for this approach. Traditionally, both judge and jury shared the task of determining the admissibility of coconspirator declarations. "Initially, the judge would make a threshold finding of whether the prosecution had properly laid the foundation and met the burden of proving the existence of the conspiracy by independent evidence." Note, "Evolution of the Coconspirator Exception to the Hearsay Rule in the Federal Courts," 16 *New Eng.L.Rev.* 617, 622 (1981). If this determination was in favor of the prosecution, the jury would be cautioned from considering the out-of-court declarations unless it was satisfied that the existence of a conspiracy had been proven by independent evidence. *Id.; see also United States v. Apollo,* 476 *F.*2d 156, 163 (5th Cir.1973); E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions,* § 27.06 (3d ed. 1977). "Even after the judge was satisfied that the foundation had been laid, the jury still had the task of deciding the true admissibility of any statements * * * Thus, the trial judge had a strong hand in determining the admissibility, but the jury had a second bite at the apple." Note, "Evolution of the Coconspirator Exception to the Hearsay Rule in the Federal Courts," *supra,* 16 *New Eng.L.Rev.* at 623.

Although, as noted by the Court, the majority of federal circuit courts have interpreted Federal Rule of Evidence 104 to require that the trial court alone dispose of the issue of the admissibility of a coconspirator's hearsay statement, *ante* at 514, the question has not been dispositively resolved. Under *Rule* 104, some courts continued to adhere to the traditional common-law practice of requiring cautionary instructions to the jury to disregard the hearsay statements if the jurors could not find that defendant was a participant in the conspiracy on the

---

against its suspect character. The method is the imposition of a procedure through which relevance and credibility are tested. Since the jury decides both of these issues, it must decide the preliminary fact question as well. To take the issue from the jury is to diminish the protection of the preliminary requirement. [Kessler, "The Coconspirator Rule", *supra,* 5 *Hofstra L.Rev.* at 95.]

basis of independent evidence. *See, e.g., United States v. Pennett,* 496 *F.*2d 293 (10th Cir.1974). Other courts refused to find prejudicial consequences resulting from such a practice, although they observed that giving the jury a "second bite at the apple" is very generous to a defendant. *United States v. Testa,* 548 *F.*2d 847, 853 n. 3 (9th Cir.1977); *United States v. Herrera,* 407 *F.Supp.* 766 (N.D.Ill.1975). Similarly, in *United States v. Petrozziello, supra,* 548 *F.*2d 20, the court, while concluding that Federal Rule of Evidence 104(a) requires judge-determination of the question, failed to find error in the lower court's instruction that the jury decide the admissibility of the coconspirator's declarations. The court noted that "[t]he added layer of fact-finding may not be needed, but it can seldom prejudice a defendant." *Id.* at 23.

I am satisfied that so long as the judge is careful in making his or her own determination, there will, normally, be no harm in permitting the jury to reconsider the matter. This State has long placed a high premium on the function of the jury as ultimate arbiter of guilt, allowing nothing to come between the jury and the discharge of this function. *State v. Collier,* 90 *N.J.* 117 (1982); *State v. Ingenito,* 87 *N.J.* 204 (1981). To remove from the jury the issue of independent proof of the conspiracy relegates to the judge instead the task of resolving the central issue of guilt—a result inconsistent with the long-protected jury role. Further, as a matter of policy, I am confident that, more often than not, allowing the jury to determine specifically the adequacy of the independent evidence of conspiracy as a condition for its consideration of coconspirator hearsay will enhance the decisional process and the ultimate search for truth.

### III

In the context of this case there are additional reasons for permitting the jury to determine the adequacy of the indepen-

dent evidence of the conspiracy involving the defendant before its evaluation of a coconspirator's extrajudicial declarations.

Typically in a complex conspiracy prosecution, the prosecutor seeks to introduce coconspirator hearsay testimony *before* its basic admissibility has been demonstrated by independent, non-hearsay evidence of the conspiracy involving the defendant. The reasons for allowing the hearsay to come before the jury "out-of-order" are usually grounded in notions of prosecutorial convenience and strategy. Frequently it is easier and more effective for the prosecution to make its presentation by proceeding first with the hearsay and later with the "connecting" evidence.

The preferred course, naturally, is for the prosecution to present proof that would fulfill the conditions for the exception before offering the coconspirator declarations, at least when it is practicable to do so. *United States v. Macklin*, 573 *F*.2d 1046, 1049 n. 3 (8th Cir.1978); *United States v. Petrozziello, supra*, 548 *F*.2d at 23 n. 3. When this is impracticable, some authorities suggest that the trial judge defer his or her ruling on admissibility until the close of the government's case, *United States v. Vinson, supra*, 606 *F*.2d at 152–53; *United States v. Ziegler, supra*, 583 *F*.2d at 80, or even until after the receipt of all the evidence, *United States v. Ciampaglia, supra*, 628 *F*. 2d at 638; *United States v. Bell, supra*, 573 *F*.2d at 1044. Although many opinions endorse the efficacy of a so-called preliminary "*James* hearing," *see United States v. James, supra*, 590 *F*.2d at 577–80, to determine if the conditions of the coconspirator exception have been met, they generally regard this as a. discretionary procedure. *See, e.g., United States v. Whitley*, 670 *F*.2d 617, 620–21 (5th Cir.1982); *United States v. Ricks*, 639 *F*.2d 1305, 1307–10 (5th Cir.1981).

In consequence, many courts have received coconspirator declarations into evidence provisionally or conditionally, subject to the later presentation of facts establishing the predicates for àdmission. *E.g., United States v. Vinson, supra*, 606 *F*.2d at

152–53; *United States v. James, supra,* 590 *F.*2d at 582; *United States v. Santiago, supra,* 582 *F.*2d at 1131; *United States v. Stanchich, supra,* 550 *F.*2d at 1298. This practice must recognize the risk or possibility that the prosecution may fail to subsequently "connect up" the hearsay to the defendant by facts authorizing its admission. However, the jury will have been permitted to hear damaging hearsay, which usually strongly suggests the existence of a criminal conspiracy and implicates the defendant as a participant in it, before independent evidence is furnished to establish defendant's membership in the conspiracy. *See State v. Simon,* 79 *N.J.* 191 (1979) (recognizing devastating impact that existence of conspiracy through special interrogatory can have on jury's deliberations, in effect, "programming" jury toward determination of ultimate guilt).

In many cases, the only practical antidote to this form of prejudice available to the courts is the cautionary instruction. Thus, at the very least the jury must be instructed at the time "unconnected" or premature coconspirator hearsay is introduced to be prepared to disregard such evidence in the event independent evidence connecting defendant to the hearsay fails to materialize. Presumably, the court, throughout the trial, will caution the jury to refrain from reaching any definitive conclusions bearing on guilt or innocence until all the evidence has been presented and the case is submitted to the jury for its final deliberations in accordance with the court's full instructions. A special cautionary instruction that attempts to sanitize the jury's consideration of coconspirator hearsay would be consistent with the court's continuing efforts to maintain objectivity and open-mindness in the jury.

In my view, such special cautionary instructions dealing with coconspirator hearsay given in the course of the trial are indispensable. This makes it imperative that when the case is finally submitted to the jury, it be authorized to consider and determine the existence of independent evidence connecting defendant with the conspiracy as a precondition to its considera-

tion of the coconspirator hearsay. Unless such a final instruction is given to the jury, it might well infer, in light of previous cautionary instructions to conditionally disregard the hearsay evidence if no independent evidence is produced, that the trial court itself determined that such independent evidence had been produced. The jury, not having been instructed to the contrary, would likely conclude that there was adequate independent evidence of defendant's conspiratorial involvement. The jury most probably would give even greater weight to the coconspirator testimony than it would had it otherwise been instructed by the court to evaluate the independent evidence of the conspiracy as a basis for considering the hearsay.

In sum, by instructing the jury, both during the trial and in its final deliberations, that it may not consider coconspirator statements as evidence of defendant's guilt until it has found independent proof of the existence of the conspiracy implicating the defendant, the trial court ensures that the policies that underlie this corroboration requirement are more satisfactorily honored. "The charge communicates to the jury the reluctance that exists, as a matter of law, in crediting this evidence. It tells them that the courts recognize its potential unreliability. It alerts them to the danger of unduly trusting the statements." Kessler, "The Coconspirator Rule," *supra*, 5 *Hofstra L.Rev.* at 96. This procedure may not reflect all of the realities of the human decision-making process. *Id.* Nevertheless, relegating to the court alone the task of determining the preliminary issue is not a preferred alternative, as it generally may also be vulnerable to undue influence from the hearsay. If, as the majority suggests, the task is truly a "practical impossibility," *ante* at 516, the delegation of the task to the jury, as well as the judge, should enhance the quality of decision-making and the determination of truth. And, in the final analysis, since it is the jurors who will make the ultimate fact determination, the "co-conspirator guidelines that were created to protect against

improvident fact decisions should be given to them." Kessler, "The Coconspirator Rule," *supra,* 5 *Hofstra L.Rev.* at 97.

For these reasons, I respectfully dissent.

Justice O'HERN joins in this dissent.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, POLLOCK and GARIBALDI—5.

*Dissenting*—Justices HANDLER and O'HERN—2.